Bellacosa, J.
(dissenting). I would reinstate plaintiffs’ law-
suit. Plaintiff Mrs. Kircher, the victim of a broad daylight abduction, a harrowing car ride and kidnapping in the countryside, and brutal beating and rape, should not have her personal injury case and that of her husband thrown out of court without a trial because of the inflexible application of catechetical rules. The court has said only recently and the majority acknowledges that it should not apply these very same rules in an "overly rigid manner”. I believe that approach is particularly wise and fair in a case such as this which does not involve allocation of police resources to prevent future harms or crimes, but rather failure to perform a duty as to a particular ongoing crime and rescue mission.
For purposes of resisting the defendant City’s and defendant police officer’s motion for summary judgment, Mrs. Kircher and her husband presented a more than sufficient basis for being permitted to try to establish a "special relationship” with the municipality and its employee, imposing on them a duty of care and of assistance in the extraordinary circumstances of this incident. There was direct uninterrupted contact between the police officer and the victim’s would-be rescuers, to whom the victim screamed for help at the very moment of her abduction in the shopping parking lot. Those persons reacted, and then acted solely on the victim’s behalf when they gave chase in their own car and when they interrupted their continued efforts to rescue her by reporting the incident in great detail to a police officer in a radio car. The victim not only screamed to those persons but knew they saw and heard her as she saw them giving chase in their own car. She surely relied on their expected imminent help and any they might get for her from appropriate officials whose duty it would be to aid and apprehend in such circumstances.
I dissent, vote to reverse the Appellate Division’s order granting summary judgment to defendants, and would give plaintiffs their day in court at a trial.
Early in the afternoon on April 20, 1984, plaintiff, Deborah Kircher, was grabbed as she left a Jamestown drug store. A *263 man, later identified as Brian Blanco, forced his way into the driver’s seat of her car. She tried to escape on the passenger side, but Blanco punched her and pulled her back into the car by her hair. Aware that two people were standing nearby, she screamed for help. The two bystanders, later identified as Karen Allen and Richard Skinner, ran toward her car, at which point Blanco sped away in the victim’s own car with her as his prisoner. The bystanders immediately returned to their car, which was parked in front of plaintiffs, and they gave chase through the streets of the small upstate City of Jamestown. Plaintiff herself asserts in her affidavit — part of the summary judgment record — that she observed the Skinner vehicle in close pursuit. At some point Skinner even tried to cut off the abduction vehicle and had to turn his vehicle into a side street. At that point, Skinner spotted an official Jamestown City Police radio car occupied by defendant Officer Carlson. The would-be rescuers halted their pursuit — though they had temporarily lost sight of the abduction vehicle — to report the ongoing incident to the officer. They provided the officer with a description of the assailant, the victim and the vehicle. They even gave the officer a slip of paper on which they had written the license plate number of the escaping vehicle. Officer Carlson asked Skinner if he knew who the victim was and Skinner responded that he did not. The officer commented that it was probably a family squabble and then assured Skinner and Allen that he would "call in” the information. Skinner and Allen, relying upon the officer’s representation, ceased pursuing or relocating the vehicle, but they did not cease their efforts on the victim’s behalf or their citizen concern for her. They returned to the drug store — the site of the abduction only minutes before — to obtain the victim’s name and address from the pharmacist. They then drove past her home several times to see if she had returned safely. Observing that she or her car had not yet returned, the witnesses themselves nevertheless went to their own home and "didn’t report anything else to the police because I [Skinner] thought it was already reported after I made the first contact” (record on appeal, Skinner’s affidavit, at 154 [emphasis added]).
The summary judgment record documents that Police Officer Carlson did absolutely nothing with respect to the citizen-reported ongoing crime. Since no official interventive efforts were even tried, and because no other police agencies or officials were notified or summoned into action, the abductor *264 was allowed to mosey along main roads of this small community in broad daylight with a terrorized victim in his sole domination. In fact, the assailant drove for 30-60 minutes until he reached the nearby Town of Gerry, where he then repeatedly assaulted and raped this young woman over a period of several hours. The next day, she was found locked in the trunk of her car, severely beaten and near death. The victim’s assailant was subsequently apprehended and convicted of serious criminal charges and is currently imprisoned.
Mrs. Kircher and her husband commenced this civil action for damages, alleging that Officer Carlson was negligent in failing to save her from the worst part of this unnecessarily prolonged and exacerbated horrifying experience when doing so would have been so simple and so intrinsic to his ordinary, official course duties. The additional consequences to her, within the details and facts of this case, were reasonably foreseeable, not "speculative” as characterized by the majority. Indeed, the aggravation of her additional, more severe injuries are directly and causally related to the inaction of the police officer, or so a jury could find. The City of Jamestown is alleged to be vicariously responsible for the conduct of its employee, Officer Carlson.
The bromide that a municipality cannot be held liable for negligence in the performance of a governmental function, including its failure to provide police protection to individual citizens, unless a special relationship existed between the municipality and the injured party, should not rescue the defendants in this case (see, De Long v County of Erie, 60 NY2d 296, 314; Riss v City of New York, 22 NY2d 579). That irony would be too bitter. There was a special relationship here. To establish one, a plaintiff must prove: (1) an assumption by the municipality, through the promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality’s agents that inaction could lead to harm; (3) some form of direct contact between the municipality’s agents and the injured party; and (4) that party’s justifiable reliance on the municipality’s affirmative undertaking (Cuffy v City of New York, 69 NY2d 255, 260). It is unnecessarily rigid on the law and on the facts to apply recent precedents to hold, as a matter of law, that there was no direct contact between plaintiff and Officer Carlson, and that as a result, plaintiff could not and did not rely on the officer’s promise of assistance.
*265 The victim was isolated by the abduction and by the nature of the crimes involved and, thus, could not personally make direct contact with the police. Under these circumstances, to impose an impossible legal duty on her perverts the jural relationship of the parties and the applicable rules. She could initiate the direct contact chain, however, and she did so, surely doing all she could then do. Aware that assistance was right at hand, she screamed to the particular persons for help, making them aware from her direct communication, not just from their own observations of her desperate plight. By making direct contact with these witnesses, she claimed them as her surrogates in coming to or getting her assistance or both. The initiation of an unbroken chain, the propinquity and the contemporaneity of the events may be deemed legally to have fulfilled the direct contact requirement, at least for purposes of allowing factual development and resolution at a trial, either actually or by legal imputation. Correspondingly, when the victim’s would-be rescuers interrupted their chase and forbore any other interceptive communications and actions they may have taken in alerting other law enforcement agencies and giving them their detailed identifying information, based on defendant Carlson’s assurance to them of taking official charge of the matter, they understandably relied for the victim and in her place. (One can only imagine the human reaction of relief and joy these citizens must have felt at coming upon a police officer and radio car at that critical juncture of an emergency chase to stop a criminal abduction in progress.) They, of course, had no personal interest of their own and were acting out of commendable civic duty — not just "compassion” — solely in the interest of a helpless victim who had called out to them and saw them give chase. They were the modern day equivalent of that medieval cavalry called the posse comitatus. The rescuers’ undisputed reliance can, as a matter of fact, be transferred to the plaintiff’s benefit on these facts because she had no one else to rely on and was prevented from seeking any other more direct aid by the actions of her abductor and by the indifference and even cynicism of the officer. There was thus a clear, continuous causal link — no break in the loop — between (a) the victim’s initiating scream for help to the civilians, (b) the officer’s promise to act, (c) the would-be rescuers’ decision to forego further personal civilian pursuit of the vehicle or other interceptive notifications, and (d) the subsequent infliction on the victim plaintiff of horrific and extended physical injuries and *266 emotional trauma. That link is even further strengthened in this case by the would-be rescuers’ decision to return to the scene of the commencement of the ongoing crime to obtain the victim’s name and address and to further check on her safety at her home. This evidence dramatically fortifies the inference that but for defendant Carlson’s assurance of official action, the civilian rescuers would have continued their mission personally or through other official instrumentalities. Detrimental reliance, actually or by appropriate legal imputation, is almost made out as a matter of law, so I cannot understand how the majority can conclude the opposite — that it is lacking as a matter of law on these facts.
Sorichetti v City of New York (65 NY2d 461) and Cuffy v City of New York (69 NY2d 255, supra) support the prudent and fair flexibility of approach to the satisfaction of the "direct contact” requirement. In Sorichetti (supra), the court held that a special relationship existed not only between the defendant City and the plaintiff mother, who had actually contacted the police concerning threats made to her by her estranged husband in violation of an order of protection, but that such relationship also arose between the City and the child-victim on whose behalf the mother had made the police contact, despite the child’s lack of direct contact with law enforcement officials herself. Thus, the court already recognizes an exception in the long litany of precedents cited in favor of black letter law; it then strains to distinguish that precedent, unsuccessfully as far as I can see.
In Cuffy (supra), plaintiffs alleged that the police had a special duty to protect them because the police promised the husband and father protection for his family, after he alerted the police of threats made by plaintiffs’ downstairs tenants. The case was allowed to go to trial. On appeal from the jury verdict in favor of plaintiffs, we held that although it was Mr. Cuffy, and not Mrs. Cuffy or her son Cyril, who had direct contact with the police, the police promise to act was deemed to run to them because it was their safety that prompted Mr. Cuffy to solicit the aid of the police, and it was their safety the officer had in mind when he promised to provide assistance (Cuffy v City of New York, 69 NY2d, at 262, supra).
Using language that could have anticipated the instant case, we expressed our reluctance to apply the direct contact requirement "in an overly rigid manner”, and noted that its proper application should depend on the particular circum *267 stances of each case. That fair approach makes good sense in the equation of the generally unfavored immunization granted by the "special duty” rule itself. Thus, we stated as long as there is a means of showing "a 'special relationship’ between the claimant and the municipality, beyond the relationship with government that all citizens share in common” (id., at 261), and there is "a basis for rationally limiting the class of citizens to whom the municipality’s 'special duty’ extends” (id., at 261), the direct contact requirement can be satisfied.
In the instant case, the policy concerns which gave rise to the direct contact requirement are not undermined or implicated. Plaintiffs are not seeking to hold defendants liable for failing to protect a member of the general public from a future unknown criminal act (Weiner v Metropolitan Transp. Auth., 55 NY2d 175). Nor are plaintiffs claiming that there should have been police assigned to a place where a crime was likely to occur or even that the police were obligated to prevent the abduction itself (Steitz v City of Beacon, 295 NY 51). In this case, the victim made direct contact with the only persons she had access to, who in turn made direct contemporaneous contact with the police about a vicious crime in progress. The hopes of the victim and her surrogate rescuers to stop the crime and prevent further harm to this particular person were dashed by the nonfeasance of the public employee, not by failure to allocate and deploy scarce municipal resources for the general public. The victim plaintiff here was indisputably set apart from the at-large community of Jamestown. She was not a possible in futuro victim of a crime. She was already in the throes of ferocious ongoing crimes. No one of the other cases has that quality or element. Thus, there can be no "rational basis” for immunizing the City’s duty — and that of its officer — to act here, by mechanical application of catechetical rules — without in the process distorting the reasons for which those rules exist in the first place.
Indeed, the policy impulses favor plaintiffs’ position in this case. The law of torts has traditionally recognized these interwoven goals: spreading the risk of loss, deterring bad conduct and encouraging good conduct (Prosser and Keeton, Torts § 1, at 6-7 [5th ed]). The latter goal is undermined by the solidification of a rule of municipal immunity from liability erected on a new privity doctrine of undeviating personal detrimental reliance. The relentless injustice of a rule so rigidly adhered to is further exemplified by another tragic case involving the identical issue in which the Appellate *268 Division granted summary judgment in favor of municipal defendants where a citizen reported a car on an ice pond, only to be told not to worry, the matter was well in hand (Bogart v Town of New Paltz, 145 AD2d 110, lv denied 74 NY2d 608 [decided today]). Two infants and their mother in that car eventually drowned as the car slowly submerged under the ice into the pond, no help ever having been sent. Thus, instead of fostering civic-mindedness and a caring attitude about one another, cases like Bogart v Town of New Paltz and the instant one discourage people away from the natural human impulse towards those high ideals. In its stead, there is bred a cynicism — a "Why bother?” attitude — borne of the seeming uselessness of importuning government help in such dire circumstances. Good Samaritans, after all, are not oblivious to the implications of affording immunity for cold municipal indifference. Finally, in this regard, I think it makes a very great difference whether we as a court craft and apply tort rules with these underlying purposes in mind. It has long been in the historic, great tradition of this common-law court to do so, especially in this area, and not to shy away from the responsibility by deferring to the Legislature (majority opn, at 259; see, e.g., Bing v Thunig, 2 NY2d 656, 667).
On a different approach, the cramped approach in this case should be contrasted to the corresponding course marked in our criminal jurisprudence recently, relaxing an overly restrictive black letter rule in order to reflect a more realistic understanding and application of the underlying reason for a rule’s existence (see, People v Blasich, 73 NY2d 673, 680-681; see also, Wood v Duff-Gordon, 222 NY 88, 91). Moreover, wooden application of checklist-type criteria is a throwback to the reign of a resuscitated privity doctrine, which we have struggled so long and so hard to deflate in recognition of the concededly more difficult, but far fairer, path to decision— hard, individualized analysis (see, e.g., MacPherson v Buick Motor Co., 217 NY 382; Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 NY2d 417, 422-424).
Defendants argue also that, even if plaintiff could satisfy the direct contact requirement, the element of the rule for plaintiff victim herself to have relied on the officer’s assurance of assistance is lacking because she was not aware of the officer’s promise to act. This argument is equally unpersuasive and inapplicable.
In Sorichetti, the victim’s unawareness of the promise of *269 protection was not fatal to the existence of a special relationship. In that case, we recognized the victim had not been the one who actually relied on the promise of assistance. We held that reliance by the person seeking protection on behalf of the victim would suffice (Sorichetti v City of New York, 65 NY2d 461, supra).
This case presents an even stronger case of imputed reliance in that context than in Sorichetti. Here, the victim herself specifically alerted Skinner and Allen to her desperate circumstance. Humanly, she could do nothing more than rely on them to come to her aid as civilians and to get official help; her real reliance was fortified by her own observation of them giving chase through the streets of Jamestown.
Sorichetti’s realistic and fair relaxation of the reliance requirement in an appropriate case was in no way displaced by Cuffy but, rather, fortified. In Cuffy, the court held that, notwithstanding the satisfaction of the direct contact requirement, Eleanor and Cyril’s recovery was barred because their injuries did not result from a justifiable reliance on the promise of police protection. The police had promised to act "first thing in the morning”. The trial testimony established that plaintiffs remained in the house of their own free will all day, even after they knew the police had failed to arrest the tenants. The difference from this victim’s circumstance is like night and day. Mrs. Kircher was unabatedly relying on her rescuers in all respects during a continuing, contemporaneous abduction. She knew they were trying to save her with or without official help. This victim, unlike the Cuffys, was a captive who could not escape the clear, present, continuing, and reported danger without outside intervention. The Cuffy decision was even after trial, not on summary judgment as here.
A few comments about Helman v County of Warren (67 NY2d 799, affg 111 AD2d 560) are necessary. It does not compel a result contrary to that which I urge because, on careful examination and understanding of that case, it instead supports the victim’s position here. In Helman, plaintiff, whose business was destroyed by fire, alleged that the damage was caused by the County’s failure to respond to a neighbor’s self-initiated fire distress call to 911. Plaintiff argued that a special relationship existed between himself and the municipality by virtue of his implied agency relationship with his neighbor, who had direct contact with 911 and who relied *270 upon the 911 operator’s assurance of assistance. The Appellate Division, in a memorandum adopted by this court, acknowledged that an implied agency situation could satisfy the direct contact and reliance requirements of the special duty rule, but nonetheless concluded that on that record no implied agency could be discerned between plaintiff and the neighbor caller (111 AD2d 560, 561-562). Here the record indisputably supports implied agency, or at least suffices to allow the issue to be developed at a trial — within Hetman’s dictum and not contrary to its holding.
In any event, the Helman plaintiff was physically able to call 911 of his own accord. He was not in a position where he was forced to rely solely on others for help; he did not expressly request his neighbor’s help; and he was completely unaware, at the time, of her attempted assistance. In the instant case, plaintiff’s desperate situation deprived her of any chance or opportunity to request police assistance for herself. She personally communicated in the only way she could to and through Skinner and Allen, and as best she could in the terror of the moment. They saw, they heard, they gave chase; and she screamed, she saw and, no doubt, she hoped, prayed and relied that they would succeed in their rescue attempt. To say as a matter of law that they were not her agents within our special duty, municipal-immunity-from-liability rules and within the reasons which gave birth to those rules just makes no common human sense and no good law.
Frankly, as to Helman, though I believe it unnecessary to do so, I would, to the extent the adopted writing of the Appellate Division may be read or applied overly broadly and inflexibly, prune it back and confine it to its precise factual boundaries and ratio decidendi.
In sum, there is no legal or policy justification to snatch from these plaintiffs their day in court with an opportunity to prove that these defendants should not be shielded from liability for failing to do their official duty, no less to offer the decent human helping hand that Skinner and Allen extended (Crosland v New York City Tr. Auth., 68 NY2d 165, 170). In another day and in a not unrelated human drama, Judge Cardozo uttered this unforgettable paragraph for a unanimous court: "Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the *271 natural and probable. The wrong that imperils life is a wrong to the imperilled victim; it is a wrong also to his rescuer.” (Wagner v International Ry. Co., 232 NY 176, 180.) Extending potential liability in favor of a rescuer against an original wrongdoer, the court concluded that a jury should determine the quality of the acts in such situations.
No less relief should be given in the instant case where the court — not a jury — grants absolution to gross municipal malfeasance. While the facts of this case are horrifying enough, the law principles can be applied coldly and analytically to reach the correct and just result — reversal and denial of summary judgment to defendants.
Chief Judge Wachtler and Judges Simons, Kaye and Ti-tone concur with Judge Alexander; Judges Hancock, Jr., and Bellacosa dissent and vote to reverse in separate opinions.
Order affirmed, with costs.