*258 OPINION OF THE COURT
Titone, J.
 In a line of cases culminating in Sorichetti v City of New York (65 NY2d 461), we recognized a narrow right to recover from a municipality for its negligent failure to provide police protection where a promise of protection was made to a particular citizen and, as a consequence, a "special duty” to that citizen arose (cf. Florence v Goldberg, 44 NY2d 189). Essential to recovery is proof that the plaintiff relied on the promise and that his reliance was causally related to the harm he suffered. In this case, there was proof of a promise of protection made by an agent of the City, but, for a variety of reasons, the reliance element was not established by any of these three plaintiffs. Accordingly, we now reverse the order appealed from and hold that the complaint against the City should have been dismissed.
The violence that led to plaintiffs’ injuries originated in a landlord-tenant dispute between Joseph and Eleanor Cuffy, who occupied the upper apartment of their two-family house in The Bronx, and Joel and Barbara Aitkins, who had leased the ground-floor apartment from the Cuffys for approximately a year. Even before the incidents that are directly involved in this action, there had been episodes between the two couples which the police had been called to mediate. Eleanor Cuffy had previously filed a formal criminal complaint against the Aitkinses, and a prior effort at supervised informal dispute resolution had terminated in an arbitrator’s order directing Ms. Cuffy and the Aitkinses to avoid further contact. This history of repeated confrontation and police intervention forms the backdrop for the events at issue in the trial of the Cuffys’ claims against the City.
Viewed in the light most favorable to plaintiffs (see, Derdia *259 rian v Felix Contr. Co. (51 NY2d 308, 312, n 1), the evidence at the trial showed that on July 27, 1981, the night immediately preceding the incident, Joel Aitkins physically attacked Eleanor Cuffy, tearing her blouse and bruising her eye. Officer Pennington, who had responded to reports of skirmishes between the Aitkinses and the Cuffys on two or three prior occasions, came to the house once again to investigate, but declined to take any specific action because, in his judgment, the offense was merely a matter of "harassment” between landlord and tenant and an arrest was not warranted.
In frustration, Joseph Cuffy, who had been to see the police four or five times before, went to the local precinct with a neighbor at about 11:00 that night to ask for protection for his family. Cuffy spoke with Lieutenant Moretti, the desk officer, and told him that the Aitkinses had threatened his family’s safety. According to both Cuffy and his neighbor, Cuffy specifically told Moretti that he intended to move his family out of its upper floor apartment immediately if an arrest was not made.* In response, Moretti told Cuffy that he should not worry and that an arrest would be made or something else would be done about the situation "first thing in the morning.” Cuffy then went back to his family and instructed his wife to unpack the family’s valises, thereby signifying his intention to remain in the house. Despite Lieutenant Moretti’s assurances, the police did not, in fact, undertake any further action in response to Cuffy’s complaint.
At approximately 7:00 p.m. on the following evening, the Cuffys’ son Ralston, who did not live with his parents, came to their house for a visit. Immediately after Ralston alit from his car, Joel Aitkins accosted him and the two men had an altercation, which culminated in Ralston’s being struck with a baseball bat. Eleanor Cuffy, who observed the fight from her upstairs window, and another son, Cyril, rushed to Ralston’s rescue. Barbara Aitkins then joined in the attack, slashing at both Eleanor and Cyril with a knife. Joseph Cuffy, who had come home from work at about 6:30 and then gone to his neighbor’s house, arrived at the scene while the fight was in progress, but was not in time to avert the harm. By the time *260 the fight was over, all three Cuffys had sustained severe injuries.
Eleanor, Cyril and Ralston Cuffy thereafter commenced this action against the City, alleging that the police had a "special duty” to protect them because of the promise that Lieutenant Moretti had made on the night preceding the incident (see, Sorichetti v City of New York, supra). The ensuing trial ended in a verdict awarding each of the plaintiffs substantial damages. The City appealed to the Appellate Division, which unanimously affirmed the judgment, without opinion. We conclude, however, that the judgment should have been reversed.
As a general rule, a municipality may not be held liable for injuries resulting from a simple failure to provide police protection (see, e.g., Weiner v Metropolitan Transp. Auth., 55 NY2d 175). This rule is derived from the principle that a municipality’s duty to provide police protection is ordinarily one owed to the public at large and not to any particular individual or class of individuals (Moch Co. v Rensselaer Water Co., 247 NY 160). Additionally, a municipality’s provision of police protection to its citizenry has long been regarded as a resource-allocating function that is better left to the discretion of the policy makers (see, Weiner v Metropolitan Transp. Auth., 55 NY2d 175, supra). Consequently, we have generally declined to hold municipalities subject to tort liability for their failure to furnish police protection to individual citizens.
There exists, however, a narrow class of cases in which we have recognized an exception to this general rule and have upheld tort claims based upon a "special relationship” between the municipality and the claimant (De Long v County of Erie, 60 NY2d 296, 304; see, e.g., Sorichetti v City of New York, supra; Florence v Goldberg, supra; Schuster v City of New York, 5 NY2d 75). The elements of this "special relationship” are: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality’s agents that inaction could lead to harm; (3) some form of direct contact between the municipality’s agents and the injured party; and (4) that party’s justifiable reliance on the municipality’s affirmative undertaking (see, Shinder v State of New York, 62 NY2d 945, 946; see also, Sorichetti v City of New York, supra, p 469; cf. Nallan v Helmsley-Spear, Inc., 50 NY2d 507).
*261 As was made clear in Yearwood v Town of Brighton (101 AD2d 498, affd 64 NY2d 667), the injured party’s reliance is as critical in establishing the existence of a "special relationship” as is the municipality’s voluntary affirmative undertaking of a duty to act. That element provides the essential causative link between the "special duty” assumed by the municipality and the alleged injury. Indeed, at the heart of most of these "special duty” cases is the unfairness that the courts have perceived in precluding recovery when a municipality’s voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection (see, De Long v County of Erie, supra, p 305; Florence v Goldberg, supra, p 197). On the other hand, when the reliance element is either not present at all or, if present, is not causally related to the ultimate harm, this underlying concern is inapplicable, and the invocation of the "special duty” exception is then no longer justified.
Another element of the "special duty” exception is the requirement that there be "some direct contact between the agents of the municipality and the injured party” (Sorichetti v City of New York, supra, p 469; see, Helman v County of Warren, 67 NY2d 799, affg 111 AD2d 560). This element, which is conceptually related to the reliance element, exists first as a natural corollary of the need to show a "special relationship” between the claimant and the municipality, beyond the relationship with government that all citizens share in common. In addition, the "direct contact” requirement serves as a basis for rationally limiting the class of citizens to whom the municipality’s "special duty” extends (cf. White v Guarente, 43 NY2d 356).
As a rule based partially on policy considerations, the direct contact requirement has not been applied in an overly rigid manner. Thus, in Sorichetti v City of New York (supra), a case involving a preexisting judicial order of protection, we allowed recovery for an infant’s injuries, although it was the infant’s distraught mother, and not the injured infant, who had the direct contact with the law enforcement officials. Our deviation from the "direct contact” requirement in that case, however, may be explained by the close relationship between the interests of the mother and those of the child, as well as by the fact that the mother’s contact with the police had been initiated solely for the purpose of obtaining protection for the *262 child, who was herself helpless. Moreover, the presence of a judicial order of protection contributed to our conclusion in Sorichetti that an actionable relationship existed (see, 65 NY2d, p 469). In any event, what Sorichetti and similar "special duty” cases teach is that the proper application of the "direct contact” requirement depends on the peculiar circumstances of each case, all of which must be considered in light of the policies underlying the narrow "special duty” doctrine.
In this case, the requirement that there be some direct contact with an agent of the municipality is fatal to the cause of action asserted by plaintiff Ralston Cuffy, the older son who was not a member of Joseph and Eleanor Cuffy’s household and did not himself have any direct contact with the police. The absence of direct contact is dispositive of Ralston’s claim for two reasons. First, unlike in Sorichetti, none of the factors militating in favor of relaxing the "direct contact” requirement are present in his case. Since Ralston did not live in the Cuffy’s home, his interests were not tied to those of the rest of his family, and it cannot be said that the assurances of protection his father had received directly from Lieutenant Moretti were obtained on his behalf. Accordingly, Ralston’s connection to the official promises that form the basis of this action is simply too remote to support recovery.
Second, and perhaps more importantly, there was no indication that Ralston even knew of the promise of protection that his father had received. His presence at the house on the day of the incident was thus merely an unfortunate coincidence and, in any event, was certainly not the result of his own reliance on any promise of protection that the police might have made (see, Helman v County of Warren, supra; Yearwood v Town of Brighton, supra). In the absence of such reliance, his claim is insufficient as a matter of law.
The claims asserted against the City by Eleanor and Cyril Cuffy present a more complex problem. Although neither of those parties had "direct contact” with the public servant Who had promised to provide the family with protection, the "special duty” undertaken by the City through its agent must be deemed to have run to them. It was their safety that prompted Joseph Cuffy to solicit the aid of the police, and it was their safety that all concerned had in mind when Lieutenant Moretti promised police assistance. It would thus be wholly unrealistic to suggest that Eleanor and Cyril Cuffy were in no different position from any other citizen or that the *263 City owed them no "special duty” simply because Joseph Cuffy, rather than they, had been the party who had "direct contact” with Lieutenant Moretti (cf. Sorichetti v City of New York, supra).
Nonetheless, Eleanor and Cyril Cuffy’s recovery is precluded for the entirely separate reason that, as a matter of law, their injuries cannot be deemed to have been the result of their justifiable reliance on the assurances of police protection that Joseph Cuffy had received. It is true that the evidence supported an inference that both of these plaintiffs remained in the house during the night of July 27, 1981 and throughout the following morning primarily because of their reliance on Lieutenant Moretti’s promise to Joseph that Joel Aitkins would be arrested or something else would be done "first thing in the morning.” However, Ms. Cuffy also testified that she had periodically looked out her front window throughout the day of the incident and had not seen any police cars pull up in front of her house and that she continued to be nervous about the situation. Thus, plaintiffs’ own evidence established that by midday on July 28th Ms. Cuffy was aware that the police had not arrested or otherwise restrained Mr. Aitkins as had been promised.
This evidence was sufficient, as a matter of law to defeat any colorable claim that Eleanor and Cyril Cuffy’s injuries were the result of any justifiable reliance on the lieutenant’s assurances. Although both of them knew or should have known by midday that the promised police action would not be forthcoming, they remained in the house hours after any further reliance on those assurances could reasonably be deemed justified. It was this continued presence in the house and the consequent continued exposure to danger that ultimately led to their participation in the melee, which was prompted, in the immediate sense, by Ralston’s arrival and his unfortunate confrontation with Aitkins.
In this regard, it is noteworthy that, according to the uncontradicted evidence, Ms. Cuffy had entertained relatives that day, her husband had been in and out of the house twice that very evening and the couple had plans to go out to dinner later that night. Thus, it certainly cannot be said that, having remained in the house overnight in reliance on the officer’s promise, the family was thereafter trapped and unable to take steps to protect itself when its members knew or should have known that police assistance would not be forthcoming.
*264 It may well be that the police were negligent in misjudging the seriousness of the threat to the Cuffys that the Aitkinses’ continued presence posed and in not taking any serious steps to assure their safety. It may also be that the police had a "special duty” to Eleanor and Cyril Cuffy because of the promise that Lieutenant Moretti had made and those plaintiffs’ overnight, justifiable reliance on that promise. It is clear, however, that those plaintiffs’ justifiable reliance, which had dissipated by midday, was not causally related to their involvement in the imbroglio with the Aitkinses on the evening of July 28th. Thus, they too failed to meet the requirements of the doctrine allowing recovery for a municipality’s failure to satisfy a "special duty,” and their claims, like those of Ralston Cuffy, should have been dismissed.
For all of the foregoing reasons, the order of the Appellate Division should be reversed, with costs, and the complaint dismissed.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Hancock, Jr., and Bellacosa concur.
Order reversed, etc.

Lieutenant Moretti had died before the trial of this action and was therefore unavailable to confirm Cuffy’s version of the conversation. However, Officer Pennington, who had returned from the field, was present at the precinct that night and was able to confirm that Cuffy had spoken to Moretti, although he never got close enough to overhear what was said.