[808 NYS2d 145]

RICHARD LARATRO et al., Appellants, v CITY OF NEW YORK et al., Respondents, and "JOHN" KORNEFFEL et al., Appellants.

First Department, November 10, 2005

## APPEARANCES OF COUNSEL

*Walter G. Alton, Jr. & Associates, P.C.*, New York City (*Walter G. Alton, Jr.* of counsel), for Richard Laratro and another, appellants.

*Silverson, Pareres & Lombardi, LLP*, New York City (*Danielle M. Morandi* of counsel), for "John" Korneffel and others, appellants.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Julie Steiner* and *Barry P. Schwartz* of counsel), for respondents.

## OPINION OF THE COURT

SAXE, J.

This appeal requires us to examine the parameters of the "special relationship" rule which holds that a municipality may not be held liable for its negligent failure in the performance of emergency services unless a special relationship exists between the municipality and the injured party (*see Cuffy v City of New York*, 69 NY2d 255 [1987]). We reverse and deny summary judgment here, concluding that questions of fact are presented, both as to whether the individual acting on plaintiff's behalf may be considered plaintiff's agent so as to satisfy the requirement of direct contact between plaintiff and the municipality's agents, and whether the municipality's voluntary undertaking lulled that agent into a false sense of security inducing her either to relax her own vigilance or to forgo other available avenues for plaintiff's protection.

### Facts

On September 10, 1999, when plaintiff Richard Laratro arrived at work, after working out at the gym and then walking to work in the rain, he complained to a bookkeeper at his company that he was not feeling well. Word was gotten to Carol Edelson, a coworker and friend of plaintiff for 12 years, that Laratro was "acting strange" and that something was wrong with him. Edelson found Laratro to be dizzy and disoriented. She took him into his office and gave him some baby aspirin. When she returned a few minutes later to check on him, he was nonresponsive. At 11:26:49 A.M., Edelson called 911. Her exact words to Alex Thomasson, the police communication technician who answered the 911 call, were: "We have an ill (ahh) member of our firm (ahh) a young man, about 52, he can't spea. . . , he's not speaking, he is very dizzy, he's not really responding and (ahh) he's sweating. I think we need an ambulance." Thomas-

son responded, "the ambulance will be there to help you as soon as possible. If his condition changes you can call us back and we will try to reconnect you."

Edelson assumed that the ambulance would arrive in 10 minutes, based on her prior experience with emergency services in New Jersey, as well as her knowledge of the hospitals near the office. She asserted that had she known that the ambulance was not going to arrive for 30 to 35 minutes, she would have driven Laratro to the hospital.

Thomasson had designated the call as a "sick" call, which on a scale of one through eight, with one being the most serious, placed the call as a level six. Thomasson was unable to reach the Fire Department EMS so the call was handled by Donna Glaude, a "relay" call receiving operator with the New York City Fire Department. Based on the description in the computer, Glaude also categorized the call as a level six. The call was then transferred from Glaude to EMS dispatcher Doreen Ascatigno, who, at 11:27:41 A.M., assigned a basic life support ambulance to Laratro. At 11:27:57 A.M., Thomasson supplemented the information on his computer to include that the patient was dizzy and having difficulty speaking, which should have changed the level of the call.

The first ambulance designated to assist Laratro was redirected to a higher priority call prior to arriving at the scene. Although another ambulance was assigned a few minutes later, that ambulance was also redirected to another call. At 11:43:11 A.M., there were no basic life support ambulances available, and although there were four advance life support ambulances available, none of them were assigned to Laratro.

At 11:43:43 A.M., Kevin Quirke, a security guard in Laratro's building with whom Edelson made contact every few minutes, was waiting for the ambulance in the lobby, and again called 911. He told the operator that he was waiting for an ambulance, and was told "help is on the way." At 11:47:22 A.M., there was no basic life support ambulance available but three advance support life ambulances were available, none of which were dispatched to Laratro.

At 11:56:23 A.M., Ascatigno assigned a basic life support ambulance from St. Clare's Hospital to Laratro, which had an estimated time of arrival at 11:57:22 A.M. However, the ambulance did not arrive on scene until 12:07:20 P.M.

At 11:57:52 A.M., Quirke called 911 again. At 11:58:34 A.M., the operator who received the call supplemented the computer

information to indicate that Laratro was then "unconscious," raising the priority level to a level two call. At that point, Ascatigno sent an advance life support ambulance to the scene, also from St. Clare's. This ambulance arrived first, at 12:01:05 P.M.

When the paramedics arrived, they recognized that Laratro was having a stroke. At 12:29:48 P.M. Laratro was taken to St. Clare's Hospital, arriving there at 12:37 P.M.

Laratro and his wife commenced this negligence and medical malpractice action. Insofar as is relevant on this appeal, they allege that the City was negligent in failing to timely respond to his call for emergency services. The City moved for summary judgment arguing that since there was no special relationship between Laratro and the City, the City was immune from liability for any failure to provide an ambulance in a timely manner. The motion court granted the City's summary judgment motion, concluding that Laratro had no direct contact with the municipality, and that Ms. Edelson was merely his coworker, rather than in a familial relationship with him. Plaintiffs now appeal.

## Discussion

The Court of Appeals has enunciated a general rule that, as a matter of policy, municipalities will not be held liable for negligence in performing governmental functions (*see Cuffy*, 69 NY2d at 260). The rule has often been applied in the context of a failure to provide police protection (*see e.g. Kircher v City of Jamestown*, 74 NY2d 251 [1989]; *Cuffy, supra*; *Bogart v Town of New Paltz*, 145 AD2d 110 [1989], *lv denied* 74 NY2d 608 [1989]; *Yearwood v Town of Brighton*, 101 AD2d 498 [1984], *affd* 64 NY2d 667 [1984]), but it has also addressed claims of negligence in other governmental services (*see e.g. Baez v City of New York*, 309 AD2d 679 [2003] [ambulance]; *S.C. Freidfertig Bldrs. v Spano Plumbing & Heating*, 173 AD2d 454 [1991] [firefighters]). The policy behind the rule is that the duty of the municipality is owed to the public at large rather than to individuals, and that such services are "limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed" (*see Riss v City of New York*, 22 NY2d 579, 581-582 [1968]; *accord Kircher, supra*; *Cuffy, supra*). The obligation of the municipality operating an emergency services dispatch center is similarly to allocate limited resources, necessarily resulting in some failures and delays, for which the municipality cannot be faulted.

Nevertheless, despite this general policy, this rule protecting municipalities is not applied

> "where a municipality voluntarily undertakes to act on behalf of a particular citizen who detrimentally relies on an illusory promise of protection . . . , because in such cases the municipality has by its conduct determined how its resources are to be allocated in respect to that circumstance and has thereby created a 'special relationship' with the individual seeking protection" (*Kircher*, 74 NY2d at 256).

The elements of the "special relationship" required for a municipality to be held liable for its negligent failure in the performance of services are:

> "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality affirmative undertaking" (*Cuffy*, 69 NY2d at 260).

Initially, the City does not dispute that the several calls made to 911 in which the nature of plaintiff's condition was explained, including the fact that he was unresponsive, and the answering assurance that an ambulance would be sent as soon as possible, is enough to establish the first two prongs of the "special relationship" test.

The central issues here are whether the "direct contact" and "justifiable reliance" requirements may be established by the actions and decisions of plaintiff's friend and coworker, Carol Edelson, when she assumed responsibility for Laratro's protection and care. These two prongs of the "special relationship" test are somewhat interrelated (*see Kircher*, 74 NY2d at 257), particularly in this context, since only if the relationship between Laratro and Edelson is close enough to permit her acting as his agent can her reliance on the assurances of the dispatcher be attributed to Laratro as well. It was she who acted on Laratro's behalf, and it was she who, relying upon the assurance that an ambulance would be sent "as soon as possible," decided to wait rather than transport plaintiff herself to the hospital.

The "direct contact" requirement, notwithstanding the term's seeming implication that the plaintiff himself must have made

contact with the municipality, may actually be satisfied where there is a "close relationship" between the interests of the caller and that of the person in need (*see Cuffy*, 69 NY2d at 261). The facts of the *Cuffy* case (*id.* at 258-259) help illustrate the application of the rule.

Joseph and Eleanor Cuffy had leased the ground floor apartment of their two-family house to Joel and Barbara Aitkins, and a pattern of repeated confrontations between the two families, requiring police intervention, developed over the year that followed; prior efforts to mediate, following a criminal complaint filed by Eleanor Cuffy, had resulted in an arbitrator's order directing Ms. Cuffy and the Aitkinses to avoid further contact. On the night immediately preceding the events at issue here, Joel Aitkins had physically attacked Eleanor Cuffy, tearing her blouse and bruising her eye. The responding officer declined to take any action because, in his judgment, the offense was merely a matter of harassment between landlord and tenant. At approximately 11 o'clock that night Joseph Cuffy went to the local precinct to ask for protection for his family, and he told the desk officer that he would move his family out of their apartment if an arrest was not made; the desk officer told him he should not worry, an arrest would be made or something else would be done first thing in the morning. Nevertheless, the police did not take any further action.

At approximately 7:00 P.M. the next evening, the Cuffy's son, Ralston, who did not live with his parents, came to visit, and was immediately accosted by Joel Aitkins, who ultimately struck him with a baseball bat. Eleanor Cuffy and another son, Cyril, rushed out to help Ralston, and Barbara Aitkins then joined the attack, slashing both Eleanor and Cyril with a knife.

On the question of "direct contact," the Court held that Joseph's visit to the police the night before the incident constituted sufficient contact for purposes of the claims by Eleanor and Cyril, inasmuch as it was their safety that prompted Joseph Cuffy to ask the police for assistance (*id.* at 262). On the other hand, Ralston's claim had to be dismissed since Ralston did not live there and had not been there when Joseph approached the police, so the assurances obtained from the police could not be said to have been obtained on his behalf (*id.*).

This holding, like that of *Sorichetti v City of New York* (65 NY2d 461 [1985]), establishes that although the direct contact requirement is normally seen as rendering agency concepts inapplicable (*see e.g. Helman v County of Warren*, 111 AD2d 560,

561-562 [1985], *affd* 67 NY2d 799 [1986]), the concept of agency is relevant to the issue of "direct contact" in that, even when there is a close familial relationship, the contact made by the person close to the injured person must have been made *on behalf of* that injured person (*Cuffy*, 69 NY2d at 262). In *Sorichetti*, the contact with the police had been made by a mother on behalf of her young child, permitting a claim by the child against the police.

However, a blood relationship between the person making contact and the injured party is not necessarily required to satisfy the direct contact requirement. In *Adderley v City of New York* (304 AD2d 485 [2003], *lv denied* 100 NY2d 511 [2003]), where the caller was the decedent's girlfriend and the mother of his child, and the decedent was unable to make the call because he was suffering from an asthma attack, it was held that the relationship was sufficient to find the direct contact prong of the special relationship test to have been established.

Nor is it even necessary that the individual who directly spoke to the municipality's agent was in some sort of familial relationship with the plaintiff in order to satisfy the "direct contact" requirement. Notably, in *S.C. Freidfertig Bldrs. v Spano Plumbing & Heating* (173 AD2d 454 [1991], *supra*), the person who made an inquiry to firefighters, questioning whether the fire was completely extinguished, was not the property owner, but an employee of the contractor, who thereafter conveyed the answer to the property owner. The Court affirmed the denial of summary judgment, explaining that "it ha[d] not been established as a matter of law that the person with whom the municipality's agent had actual contact and to whom that agent made assurances was not acting on behalf of the plaintiff and did not obtain those assurances on the plaintiff's behalf" (*id.* at 455).

However, it *is* well established that a call made by an individual merely acting as a good samaritan by contacting the police after observing a stranger in severe danger or distress cannot satisfy the "close relationship" requirement (*see Kircher*, 74 NY2d 251 [1989], *supra*; *see also Bogart v Town of New Paltz*, 145 AD2d 110 [1989], *supra*). Nor is the requirement satisfied by the calls of disinterested fellow building residents (*see Merced v City of New York*, 75 NY2d 798 [1990]; *Baez v City of New York, supra*; *Kodryanu v City of New York*, 274 AD2d 376 [2000]).

Accordingly, the City characterizes Edelson as a "mere" friend of Laratro, so as to equate the present case with this type of "good samaritan" case. However, many kinds of relationships are covered by the word "friend." In the face of the allegations, we cannot categorically state, as a matter of law, that Edelson's relationship with Laratro was not close enough to qualify her contact with emergency services on his behalf as direct contact by plaintiff.

The characterization of their relationship offered by plaintiff establishes far more than the type of "disinterested . . . volunteer[ ]" discussed in *Baez* (309 AD2d at 680). The assertions indicate that Edelson was not simply a longtime coworker; her close personal 12-year friendship with Laratro was such that other coworkers knew they should contact her to take charge of his care and protection, and such that, had she not been confident that help would arrive swiftly, she would have transported him to the hospital herself. These factual assertions stand in sharp contrast to defendant's entirely unsupported assertion that a strong financial, emotional or familial relationship does not exist between Laratro and Edelson.

This is not to say that we can now determine the nature of their relationship. Rather, particularly inasmuch as courts have remarked that the direct contact requirement is not applied in an overly rigid manner and the proper application thereof depends on the particular circumstances of each case (*see Cuffy*, 69 NY2d at 261-262), there was sufficient evidence to create a question of fact as to whether the contact on the part of Edelson acting on behalf of an incapacitated Laratro satisfies the direct contact requirement.

The conclusion that the relationship between plaintiff and the friend who contacted emergency services *may* satisfy the direct contact requirement does not, as the dissent suggests, expand municipal liability. It simply recognizes the nature of the exceptions already established by case law, and leaves open the fact question of whether this particular relationship falls within those exceptions.

By the same token, there is a factual question presented as to whether Edelson's reliance on the assurance of police communication technician Alex Thomasson, that an ambulance would be there as soon as possible, satisfies the justifiable reliance requirement. Justifiable reliance

"provides the essential causative link between the

'special duty' assumed by the municipality and the alleged injury. Indeed, at the heart of most of these 'special duty' cases is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection" (*Cuffy, supra* at 261).

A mere expectation that help would be coming or a belief that help was on the way is insufficient to establish justifiable reliance (*see Grieshaber v City of Albany*, 279 AD2d 232 [2001], *lv denied* 96 NY2d 719 [2001]). Here, however, plaintiffs' evidence established that Edelson, having been assured that an ambulance would be there "as soon as possible," acted in response to these assurances. She did not attempt to move Laratro from the office, and she monitored him as well as the phones at the reception desk, repeatedly calling downstairs to check whether the ambulance had arrived, all in reliance on the assurance that the ambulance was coming. Particularly in view of Edelson's testimony that had she known that the ambulance was going to take so long, she would have driven Laratro to the hospital, the evidence permits an inference that Edelson, acting in Laratro's interest and on his behalf, was lulled into a sense of security that the paramedics would be there shortly to help, instead of taking affirmative steps herself to get him help.

These circumstances are not amenable to determination as a matter of law. Fact issues are presented as to whether a special relationship was created, so as to bring plaintiffs' claim within the established exception to the general rule that the City will not be held liable for its negligence in providing services.

Accordingly, the order of the Supreme Court, New York County (Eileen Bransten, J.), entered April 5, 2004, which, insofar as appealed from as limited by the briefs, granted the motion of codefendants City of New York, Fire Department of the City of New York and Fire Department of the City of New York-Emergency Medical Service for summary judgment dismissal, should be reversed, on the law, without costs, the motion denied and the complaint reinstated as against the moving defendants.

MARLOW, J. (dissenting). As a general rule, a municipality is not liable for injuries sustained as the result of a failure to perform a governmental function, an immunity which includes

providing police and fire protection and emergency assistance (*see Cuffy v City of New York*, 69 NY2d 255 [1987]; *De Long v County of Erie*, 60 NY2d 296 [1983]). This rule stems from the principle that a municipality's duty to provide protection or assistance is owed to the public at large, not to any one individual (*see Cuffy, supra*; *accord Kircher v City of Jamestown*, 74 NY2d 251 [1989]). A tort claim will be allowed as an exception to this general rule of law only if a "special relationship" exists between the municipality and the plaintiff (*see Cuffy, supra*). The Court of Appeals has explained that, in order to establish a special relationship, a plaintiff must satisfy four elements (*id.* at 260). This plaintiff has not satisfied the "direct contact" element as that phrase has been defined by current decisional law. Therefore, I respectfully dissent and would affirm the order granting the City defendants summary judgment.

In order to prove direct contact, the injured party must demonstrate that he or she relied on the municipality's voluntary undertaking. In addition to reliance, a plaintiff must also establish "some direct contact between agents of the municipality and the injured party" (*Sorichetti v City of New York*, 65 NY2d 461, 469 [1985]). This presents an obstacle which this plaintiff cannot overcome. While this element has been expanded to include situations where a third party, and not the injured plaintiff, was in direct contact with and relied on the municipality's representations and/or assurances, these exceptions are limited and are narrowly prescribed.

Generally, a third party who requests assistance from a municipality on behalf of another cannot satisfy the direct contact element of a special relationship.[1] Rather, a plaintiff must show that the third party and the plaintiff were family members,[2] that the plaintiff and the third party shared a family-

---

**1.** *Merced v City of New York*, 75 NY2d 798 (1990); *Kircher v City of Jamestown*, 74 NY2d 251 (1989); *Baez v City of New York*, 309 AD2d 679 (2003); *D'Ambra v Di Donna*, 305 AD2d 958 (2003); *Valdes v New York City Hous. Auth.*, 244 AD2d 175 (1997); *Bogart v Town of New Paltz*, 145 AD2d 110 (1989), *lv denied* 74 NY2d 608 (1989); *Helman v County of Warren*, 111 AD2d 560 (1985), *affd* 67 NY2d 799 (1986); *but see Thomas v City of Auburn*, 217 AD2d 934 (4th Dept 1995).

**2.** (*Cuffy v City of New York*, 69 NY2d 255 [1987]; *Kodryanu v City of New York*, 274 AD2d 376 [2000]; *Stata v Village of Waterford*, 225 AD2d 163 [1996]; *Berliner v Thompson*, 174 AD2d 220 [1992]; *Harris v City of New York*, 147 AD2d 186 [1989].) Notably, the courts have declined to find direct contact even where the plaintiff and third party were related (*see Cuffy, supra*; *Estate of Scheuer v City of New York*, 10 AD3d 272 [2004]).

like relationship,[3] that a contractual relationship existed between the plaintiff and the third party,[4] or that an order of protection had been issued for plaintiff's benefit.[5]

In expanding the parameters of liability "courts must be mindful of the precedential, and consequential, future effects of their rulings" (*Lauer v City of New York*, 95 NY2d 95, 100 [2000]) and "limit the legal consequences of wrongs to a controllable degree" (*Tobin v Grossman*, 24 NY2d 609, 619 [1969]). The narrow exceptions to direct contact have never been expanded by any New York State appellate court to encompass the type of relationship plaintiff urges.[6] Therefore, I believe that a decision to permit a tort claim against a municipality for negligently provided emergency services based on direct contact by a plaintiff's coworker—rather than by the injured worker— should be made by the Court of Appeals or the Legislature, rather than by an intermediate appellate court, for the following reasons: (1) the lack of precedent; (2) the clear line the Court of Appeals drew in *Cuffy*; and (3) the significantly increased liability exposure to municipalities that will ensue from enlarging the class of persons who may claim a "special relationship" with a municipality.

MAZZARELLI, J.P., GONZALEZ and SWEENY, JJ., concur with SAXE, J.; MARLOW, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered April 5, 2004, reversed, on the law, without costs, the municipal defendants' motion for summary judgment dismissal denied, and the complaint reinstated as against them.

---

**3.** *Adderley v City of New York*, 304 AD2d 485 (2003), *lv denied* 100 NY2d 511 (2003).

**4.** *S.C. Freidfertig Bldrs. v Spano Plumbing & Heating*, 173 AD2d 454 (1991); *but see Hancock v City of New York*, 230 AD2d 603 (1996).

**5.** *Mastroianni v County of Suffolk*, 91 NY2d 198 (1997); *Sorichetti v City of New York*, 65 NY2d 461 (1985); *Tarnaras v County of Nassau*, 264 AD2d 390 (1999); *Berliner v Thompson*, 174 AD2d 220 (1992).

**6.** In *Fonville v New York City Health & Hosps. Corp.* (300 AD2d 623 [2002]), the plaintiff's decedent became ill at work and a colleague called EMS. The Second Department found that no special relationship existed that would give rise to a special duty. Similarly, in *Greene v City of New York* (205 AD2d 584 [1994], *lv denied* 84 NY2d 808 [1994]), the fact that decedent's employer called police was insufficient to establish a special relationship absent evidence that employer had received assurances from police and that those assurances had been communicated to decedent and that decedent had relied on them.