James v City of New York (2025 NY Slip Op 51822(U))

[*1]

James v City of New York

2025 NY Slip Op 51822(U)

Decided on November 18, 2025

Supreme Court, Kings County

Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 18, 2025
Supreme Court, Kings County

Lynette James, as the Administrator of the Estate of ANDISA SANCHEZ, Deceased, Plaintiff,

against
City of New York, NEW YORK CITY FIRE DEPARTMENT, 
 KATHLEEN EDOUARD, M.D. and INTERFAITH MEDICAL CENTER, Defendants.

Index No. 511383/2018

Plaintiff
Frances L. Garfinkel ([email protected])
Silver & Kelmachter, LLP
11 Park Place Suite 1503
New York, NY 10007
212-661-8400
Defendants City of New York and New York City Fire Department
Kathleen Mary Beck ([email protected])
The New York City Law Department
100 Church Street, New York, NY 10007
212-356-3155
Defendants Kathleen Edouard, M.D. and Interfaith Medical Center
Timothy John Lenane ([email protected])
Voute Lohrfink McAndrew & Meisner, LLP
170 Hamilton Avenue
White Plains, NY 10601
914-946-1400

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: Seq. 5: 107 — 108, 109 — 121, 145 — 149, 155, 157
Seq. 6: 122 — 123, 124 — 143, 144, 150 — 154, 156, 158
Defendants Kathleen Edouard, M.D. ("Dr. Edouard") and Interfaith Medical Center ("Interfaith") move for an Order, pursuant to CPLR 3212, granting summary judgment in their [*2]favor and dismissing Plaintiff's Complaint against them (Seq. No. 5).
Defendants The City of New York ("the City"), also sued herein as The New York City Fire Department, move for an Order to dismiss this action, pursuant to CPLR 3211 (a) (7), or to grant summary judgment in their favor, pursuant to CPLR 3212, on the basis of governmental immunity (Seq. No. 6).
Plaintiff opposes both motions. Co-defendants Dr. Edouard and Interfaith also submitted opposition to the City's motion.
Plaintiff commenced this action on June 1, 2018, asserting claims of general negligence, medical malpractice, and wrongful death in connection to his prehospital care, transport, and delivery by the City's Emergency Medical Services (EMS), and his treatment at Interfaith upon his arrival to the emergency department.
On March 6, 2017, an ambulance was dispatched to the home of Decedent following a 911 call from his friend at 8:22 p.m. Decedent was 22 years old and began experiencing back pain and extremity numbness while running. He also experienced chest tightness and said he felt like he was "dying," according to his friend who made the 911 call, but this is not documented in the medical records.
Basic Emergency Medical Technicians Omar Harvey ("EMT Harvey") and Matthew Lyde arrived at the residence at 8:33 p.m. They performed a Basic Life Support Assessment, administered oxygen by non-rebreather mask, and recorded that Decedent's pupils were dilated and he complained of back pain and extremity numbness. His blood pressure on the scene was normal (108/60 and 110/66).
The EMTs transported Decedent to Interfaith hospital by ambulance. According to the Interfaith records, he arrived at the hospital at 9:01 p.m. EMT Harvey signed a Prehospital Care Report at 9:17 p.m., and Interfaith triage nurse Keisandra Griffith signed the form at 9:24 p.m. The Prehospital Care Report noted Decedent was "mentally incapable" of signing, although EMT Harvey testified that he was incapable due to his numbness (Harvey deposition tr at 43).
Nurse Griffith entered a Triage Assessment note at 9:34 p.m. Decedent was placed on a cardiac monitor, and his chief complaint was recorded as "possible drug ingestion," based on her evaluation of Decedent's pupils, lethargy, and mental state ("unable to answer triage questions"). At the time of Nurse Griffith's examination, he was hypotensive with blood pressure of 65/40, a significant drop from the last blood pressure recorded by the EMTs at 8:49 p.m.
The attending physician Dr. Edouard assessed Decedent for the first time at 9:39 p.m. He was "unresponsive, not arousable to stimuli" according to the chart, and his pupils were dilated and minimally reactive. He had "no respiratory distress" and normal breath sounds on examination. Dr. Edouard placed orders for tests including a complete blood count and comprehensive metabolic panel at 9:45 p.m. The blood test results ultimately revealed elevated potassium, but they did not return until 10:48 p.m.
At 10:09 p.m., Decedent went into cardiac arrest and a Code 33 was called. Epinephrine and other IV medications were administered, while chest compressions and Advanced Cardiovascular Life Support measures continued. After 44 minutes of resuscitation efforts, Decedent was pronounced dead at 10:53 p.m.
Plaintiff alleges that Dr. Edouard and the Interfaith staff departed from the standard of care by failing to timely diagnose and treat Decedent for hyperkalemia, an excess of potassium in the blood. They allege the providers failed to emergently transfer Decedent to a critical care bed, place a 12-lead EKG, and obtain a comprehensive metabolic panel on a stat/emergent basis. [*3]They allege these departures proximately caused his worsened condition, cardiac arrest, and death. Plaintiff also alleges that the City defendants, through EMT Harvey, were negligent in documenting and reporting his symptoms and alerting the Interfaith staff of his condition.
Plaintiff's counsel confirmed before this Court that they have withdrawn any claims in their bill of particulars related to diagnosis of asthma and lack of informed consent, and they do not oppose the dismissal of those claims.
Addressing the City's motion (Seq. No. 6), the movants argue that they are immune from liability in this action under the governmental function doctrine.
As a threshold matter on governmental function immunity, "the first issue for a court to decide is whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose" (Applewhite v Accuhealth, Inc., 21 NY3d 420, 425 [2013]). "A government entity performs a purely proprietary role when its activities essentially substitute or supplement traditionally private enterprises," whereas government functions are "undertaken for the protection and safety of the public pursuant to general police powers" (i.d.). "If the municipality's actions fall on the proprietary side, it is subject to suit under the ordinary rules of negligence applicable to nongovernmental parties" (Ortiz v City of New York, 171 AD3d 1198, 1199 [2d Dept 2019], quoting Wittorf v City of New York, 23 NY3d 473 [2014]). If they were acting in a governmental capacity, they are generally immune from liability, except in narrow circumstances where the acts were ministerial in nature and a "special duty" was owed to the injured party (i.d.).
As the Court of Appeals conclusively held in 2013, emergency medical services are closely associated with police and fire protection, and these services have "widely been considered one of government's critical duties" (Applewhite at 428). Thus, Applewhite and its progeny have held that "publicly employed, front-line EMTs and other first responders" are performing a governmental function. In its seminal decision, the court noted that "the EMTs employed by the New York City Fire Department (FDNY) and deployed via the 911 system receive training in basic life support techniques and their range of approved emergency services is limited by law . . . EMTs cannot be realistically compared to the proprietary medical professionals whose licensure requires extensive educational and training credentials, and who typically provide services at hospital or medical facilities rather than in the unpredictable community-at-large." (I.d. at 428-429).
Here, Plaintiff concedes that the City's EMTs were performing a governmental function, not a proprietary one, in rendering ambulance and emergency medical services in response to a 911 call.
The City further argues that the EMTs' actions were entirely discretionary, stating "the record is replete with examples of the judgment exercised by the EMTs" such as performing a head-to-toe examination of Decedent, "making the determination to immediately transport [him] to the hospital," and administering supplemental oxygen. Therefore, they argue that the City is shielded from liability for the discretionary acts of the EMTs.
In the alternative, they argue that even if the EMTs' actions were ministerial, the City "cannot be held liable unless it owed a 'special duty' to the injured party" (Applewhite at 423; see also Laratro v City of New York, 8 NY3d 79 [2006]). A municipal defendant may only be held liable in these circumstances if they "voluntarily assumed a special relationship with the plaintiff beyond the duty that is owed to the public generally" (i.d. at 430). The movants argue that in this case, there is no evidence Decedent was "assured" an ambulance would be dispatched [*4]immediately when his friend called 911. They also argue there was no evidence that any verbal promises or assurances were made by the EMTs to Decedent on the scene, or that Decedent "justifiably relied" on the EMTs to his detriment. For these reasons, they argue that the City owed no "special duty" to Decedent, and the action must be dismissed against them on the basis of governmental immunity.
Thus, the next query is whether the EMT's actions were discretionary or ministerial. A municipality performing a governmental function is immune from any negligence liability for "a public employee's discretionary acts — meaning conduct involving the exercise of reasoned judgment" (Valdez at 76). This doctrine acts as a shield which protects "the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits" (id., quoting Mon v City of New York, 78 NY2d 309, 313 [1991]). "A public employee's discretionary acts . . . may not result in the municipality's liability even when the conduct is negligent" (Lauer v City of New York, 95 NY2d 95, 115 [2000].)
In contrast, this broad "discretionary" immunity does not apply to ministerial acts which involve "direct adherence to a governing rule or standard with a compulsory result" (Kralkin v City of New York, 204 AD3d 772 [2d Dept 2022]). Liability may be imposed on the City for ministerial actions, but only when there is a violation of "a special duty owed to the plaintiff, apart from any duty to the public in general" (Walker-Rodriguez v City of New York, 231 AD3d 1090, 1093 [2d Dept 2024], quoting Ferreira v City of Binghamton, 38 NY3d 298 [2022]).
In other words, while it is a long-standing principle that the City is immune from liability in all discretionary actions of employees, ministerial actions are subject to the special duty/special relationship doctrine. "[A] plaintiff may only hold the municipality liable for actions taken in its governmental capacity where (1) a special duty exists and (2) the municipality's actions were ministerial in nature" (Walker-Rodriguez at 1093).
As argued by the City movants, courts have found the actions of emergency medical technicians were discretionary in some fact-specific cases. Where 911 dispatchers and emergency providers on the scene use "their discretion in responding to each call, based on the individual patient," it follows that they are exercising "reasoned judgment which could typically produce different acceptable results, whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result" (Kralkin at 773). The Second Department has found that "EMTs exercised their discretion in declining to immediately transport [the patient] to the nearby hospital and to instead wait for the paramedics in the ALS ambulance to arrive" (Walker-Rodriguez at 1093-1094). In another case cited by the movants, they found that paramedics "exercised their discretion in reassessing [the patient's] condition upon their arrival at the scene and in administering an IV prior to transporting her to the hospital" (Dixon v City of New York, 120 AD3d 751, 753 [2d Dept 2014]), lv denied 26 NY3d 913 [2015]). However, defendants seeking summary judgment on these grounds have the burden of establishing that the acts which gave rise to the claim were, in fact, exercises of discretion (see Dixon at 753).
This is not always the case for claims arising from "the quintessential purpose of the municipal ambulance system — transporting the patient to the hospital as quickly as possible" (Kupferstein v City of New York, 101 AD3d 952, 953 [2d Dept 2012]). Government acts that involve adherence to standards and protocols are generally ministerial, and discretionary immunity does not apply when the defendant "violates its own internal rules and policies and exercises no judgment or discretion" (Devlin v City of New York, 193 AD3d 819, 821 [2d Dept [*5]2021]). As the Second Department has held, immunity "cannot attach unless the municipal defendant establishes that the discretion possessed by its employes was in fact exercised in relation to the conduct on which liability is predicated" (i.d. [emphasis added]). In many cases, courts have determined that basic EMTs were performing ministerial actions and applied the "special duty" doctrine (see Boland v City of New York, 209 AD3d 960, 960-961 [2d Dept 2022]; Koyko v City of New York, 189 AD3d 811, 811 [2d Dept 2020]).
Here, Plaintiff argues that the acts of the EMTs' were ministerial in nature. On this issue, Plaintiff notes that one of the claims alleged against the City employees is a failure to "adhere to EMS/FDNY protocols." Plaintiff submits a 20-page excerpt of EMS policies and procedures relevant to their claims, which were in effect during the events of this case. Plaintiff argues that the EMTs actions were ministerial, because they were mandated to follow these protocols and "failed to follow and ignored several fundamental protocols pertaining to documentation and appropriate and timely transfer."
Specifically, Plaintiff submits the EMS protocols for "Delivery of Patients to an Appropriate Hospital." It provides that "upon arrival" to the hospital, the EMT shall "deliver the patient directly to the appropriate hospital emergency department receiving (triage) area" and "provide a formal patient presentation to the triage nurse or other hospital receiving agent." The document also states that if a patient needs to be moved to another unit, "the total time spent awaiting triage and/or escort is not to exceed ten minutes" and "the hospital must receive the patient." A crucial part of this case is the unexplained delay between their arrival at 9:01 p.m., EMT Harvey's signature on the Prehospital Care Report at 9:17 p.m., and Nurse Griffith's signature at 9:24 p.m. Plaintiff alleges that Decedent's condition continued to worsen and he received no treatment during this 16-23 minute period, which was not the result of a "discretionary" exercise of judgment but a direct violation of the protocols for promptly transferring the patient's care for triage by the hospital staff.
Plaintiff also attaches the EMS protocols on "Preparation and Review of Prehospital Care Reports." Although some of the PDF is illegible, it states that the data on "patient assessment, treatment and call disposition shall be documented as completely as possible." Plaintiff alleges that EMT Harvey did not completely and properly prepare the Prehospital Care Report, leaving out information on how Decedent's symptoms first manifested (while exercising/running), not specifying the location and extent of his extremity numbness, and not documenting his altered mental status and blood pressure, which sharply deteriorated at an unclear point in time before the hospital's triage assessment.
In reply, the City cites to a recent First Department case, which held that "a generally uniform approach in assessment and care" through protocols and guidelines did not negate the discretionary nature of the firefighters' decision-making when they allowed the decedent to descend a flight of stairs (Morales v City of New York, 235 AD3d 595, 597 [1st Dept 2025]). However, that decision is easily distinguished from the facts in this case. The movants here have not established that Plaintiff's claims against the EMTs at issue "actually resulted from discretionary decision-making, meaning the exercise of reasoned judgment which could typically produce different acceptable results" (Devlin at 151, quoting Valdez at 79). Contrary to the City's argument, they did not establish the alleged failure to properly document and report his history and symptoms to hospital staff was a product of reasoned judgment. They also did not address the 16-23 minute gap of time between the arrival of the ambulance at Interfaith and the preparation and handoff of the Prehospital Care Report.
Instead, the alleged acts and omissions herein include negligently recording Decedent's complaints, preparing the Prehospital Care Report, and presenting Decedent to the appropriate hospital staff in a timely manner, allegedly delaying his treatment for over 20 minutes while his blood pressure lowered and he became unresponsive. Further, Plaintiff demonstrated that these acts were governed by a "rule or standard with a compulsory result," and the alleged violations of EMS' "own internal rules and policies" cannot be discretionary (Kralkin at 772; Devlin at 821). Based upon these claims, and submissions in support and in opposition thereof, the Court determines that the defendants were engaged in ministerial acts within a governmental function as a provider of emergency medical services, such that the defendants may not be held liable to the plaintiff unless they owed the plaintiff or the decedent a special duty (see Applewhite at 426; Halberstam v Port Auth. of New York and New Jersey, 175 AD3d 1264, 1266 [2d Dept 2019]).
Addressing the question of "special duty," a relationship to the injured party beyond the City's general duty to the public must exist in order to impose liability for ministerial actions (see Cruz v City of New York, 211 AD3d 1011 [2d Dept 2022]; Valdez at 76). That special duty/relationship was outlined in Cuffy v City of New York (69 NY2d 255 [1987]), with four necessary elements:
"(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) the party's justifiable reliance on the municipality's affirmative undertaking."
The special duty doctrine ultimately places a "heavy burden" on the plaintiff to prove all four elements at trial (Halberstam at 1266). The fourth element is especially "critical" to the doctrine, as it "provides the essential causative link between the 'special duty' assumed by the municipality and the alleged injury" (Valdez at 81). However, at the summary judgment stage, the Plaintiff need only raise a triable issue of fact if the movant meets their initial prima facie burden. "Whether a special relationship exists is generally a question for the jury" (Santaiti v Town of Ramapo, 162 AD3d 921, 924 [2d Dept 2018], quoting Coleson v City of New York, 24 NY3d 476, 483 [2014]).
Many notable cases addressing special duty involve alleged assurances made by police to a person receiving violent threats, resulting in harm when that person relied on police protection rather than leaving their home or remaining vigilant of the threat (Cuffy at 259; Valdez at 82). As the court stated in Cuffy, the "heart" of special duty cases are situations where "a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection" (Cuffy at 261).
In the context of emergency medical services, the issue in Applewhite turned on whether "a fact finder could conclude that it was reasonable for [the patient's] mother to rely on the EMTs' alleged assurances rather than seek an alternative method for transporting [her daughter] to the nearby hospital," and whether the "EMTs' statements or conduct deprived plaintiffs of assistance that reasonably could have been expected from another source" (Applewhite at 431). In Applewhite, the court ultimately held these were issues of fact that must be resolved by a jury.
Here, it is noted that Plaintiff's Complaint pleads that the City "affirmatively undertook a special relationship" and "special duty of care" with Decedent, and he "relied upon this." As [*6]Plaintiff argues, it is not disputed that the EMTs in this case had "knowledge that inaction could lead to harm" (the second Cuffy element), due to Decedent's visible symptoms and deteriorating condition. As demonstrated by the testimony and medical record, Decedent's dilated pupils and other symptoms alerted the EMTs he should be promptly transported to the hospital for a higher level of care. This, Plaintiff argues, demonstrates knowledge that a delay in presenting him to the hospital staff could result in harm.
With respect to "some form of direct contact" with Decedent (the third Cuffy element), Plaintiff states that "Decedent clearly understood that he would be taken to a hospital for evaluation and treatment." While there is some dispute in the record as to when Decedent became unresponsive, he was repeatedly documented by the EMTs to be "alert," and notations include "PT [patient] complains," "states," "denies," which indicate that he was communicating with the EMTs directly and not only through his friend.
The City does not dispute that the "knowledge" and "contact" elements are satisfied, and they primarily focus on the first and fourth elements of Cuffy, arguing that there are no facts and circumstances here which show "justifiable and detrimental reliance" on an affirmative undertaking.
Plaintiff argues in their opposition that there are issues of fact as to these elements. First, they argue the EMTs assumed an affirmative duty to Decedent by rendering medical assistance, emphasizing that the language of Cuffy states "an assumption by the municipality through promises or actions of an affirmative duty." Plaintiff argues that "by dispatching an ambulance to render medical services to the decedent, rendering those services and undertaking to transport the decedent to the hospital and communicating to the hospital the decedent's condition in a Prehospital Care Report," they affirmatively assumed a duty to render non-negligent emergency medical care. Plaintiff also argues that by remaining at the hospital and allegedly waiting "idly" for an extended period from at least 9:01 p.m. to 9:17 p.m., EMT Harvey assumed an affirmative duty beyond that to the general public. The Court finds Plaintiffs have raised an issue of fact as to whether this conduct constituted an assumption of an affirmative duty to act on Decedent's behalf.
On the fourth element, it has long been held that the required "justifiable reliance" of Cuffy is established through contact with the injured party directly, or assurances to an immediate family member which may be imputed to the injured party (Laratro at 84 [2006]). Any alleged promises or assurances made to Decedent's friend are therefore not relevant. However, drawing all inferences in the light most favorable to the non-moving Plaintiff, there is sufficient evidence in the record that Decedent himself was vocalizing his need for medical attention to his friends, prompting them to call 911 rather than take him to a hospital directly. Additionally, based on the records, at least for some of the time at issue, Decedent was consciously aware and communicating his symptoms to the EMTs, supporting a finding that by their actions they assumed an affirmative duty on which Decedent justifiably relied. Further, during the approximately 20-minute delay in receiving triage assessment at the hospital, there is an issue of fact as to whether the EMT remaining with Decedent assumed an affirmative duty to act on his behalf through his conduct, on which Decedent relied. As Plaintiff argues, Decedent was wholly reliant on the EMT providers rather than seeking any other source of help as his condition worsened, before he ultimately became unresponsive.
Decedent's increasingly weakened state does not rule out that he may have been deprived of other avenues of seeking medical attention and assistance — when his friend initially called [*7]911 and during the precious minutes the EMTs were with him at the hospital before they completed the "patient presentation to the triage nurse" protocol. Thus, a jury could conclude upon trial that Decedent relied on the EMTs' actions and assurances "rather than seek an alternative method" or obtain "assistance that reasonably could have been expected from another source" (Applewhite at 43).
In sum, this Court finds the EMTs' actions raise similar issues of fact as in Applewhite, regarding the alleged voluntary duty undertaken and Decedent's justifiable reliance. The Court therefore cannot find as a matter of law that no "special duty" existed under these circumstances. There is at least a question for the jury as to whether Decedent justifiably relied on a voluntary duty undertaken by the City's EMTs through their conduct, and he was placed "in a worse position than they would have been in had the defendant never assumed the duty" (Halberstam at 1267; c.f. Holloway v City of New York, 141 AD3d 688 [2d Dept 2016]).
Co-defendants Interfaith and Dr. Edouard also submit opposition to the City's motion. While the Court has already addressed the "special duty" issue, the co-defendants offer an alternative argument that the EMTs were acting in a proprietary, non-governmental role. The only cases they cite in opposition are those which predate Applewhite and are not binding on the circumstances of this case. Although medical and psychiatric care is traditionally seen as proprietary, with public hospitals and health care providers holding the same duty of care as private institutions, the provision of police, fire, and emergency medical services is a "classic governmental, rather than proprietary, function" for the general safety of the public (Applewhite at 430; c.f. Schrempf v State, 66 NY2d 289 [1985]).
The alleged acts and omissions of the basic life support EMTs herein, including failure to properly document the patient's symptoms and history, call for advanced medical assistance, and timely transfer his care to the hospital's medical staff for triage, all fall within the "classic governmental function" of front-line, basic life support EMTs established by Applewhite and subsequent case law. This Court therefore rejects the argument that the City defendants were performing a "proprietary" function in this case.
In sum, there are issues of fact as to whether the EMTs assumed a special duty toward Decedent which must be resolved by a jury. The City's motion for summary judgment on the basis of governmental immunity is denied.
Turning to Interfaith and Dr. Edouard's motion (Seq. No. 5), in a motion for summary judgment in a medical malpractice action, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure" (Rosenzweig v Hadpawat, 229 AD3d 650, 652 [2d Dept 2024]). "In order to sustain this prima facie burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's complaint and bill of particulars" (Martinez v Orange Regional Med. Ctr., 203 AD3d 910, 912 [2d Dept 2022]). Failure to meet the prima facie burden requires denial of the motion, regardless of the sufficiency of the opposing papers (Winegrad v. New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). "Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (Rosenzweig at 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, [*8]speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]). Expert opinions must set forth explanations of their reasoning and rely on "specifically cited evidence in the record" (Tsitrin v. New York Community Hosp., 154 AD3d 994, 996 [2d Dept 2017]).
In support of their motion, Dr. Edouard and Interfaith submit an expert affirmation from Mark Silberman, M.D. ("Dr. Silberman"), a licensed physician board certified in emergency medical, internal medicine, critical care medicine, and pulmonary medicine.
Dr. Silberman opines that the Interfaith physicians and staff, including attending physician Dr. Edouard, did not fail to timely diagnose and treat Decedent's hyperkalemia. Regarding the alleged delay in treatment, the expert acknowledges that the patient was "received" at 9:01 p.m., the EMT signed the Prehospital Care Report at 9:17 p.m. and the same report "was not signed by Nurse Griffith, the triage nurse, until 9:24 p.m., and sometime after that, the patient was brought to a bed in the Emergency Department." The expert then states that the EMTs remained with Decedent "until at least 9:24 p.m. and did not take any medical action or note any abnormal or concerning findings." The expert concludes that "all actions taken by the movants from the time they assumed care of the patient until his death were timely, appropriate, and within the standard of care."
The expert also opines that Decedent did not exhibit clear signs and symptoms of hyperkalemia. Dr. Silberman states that hyperkalemia symptoms "may include abdominal pain, diarrhea, nausea, and vomiting," and more severe symptoms "can include chest pain, palpitations, irregular or rapid heartbeat, as well as muscle weakness or numbness in the limbs." The expert states that of those symptoms, the only complaint reported by Decedent was limb numbness. Therefore, he opines that there was no departure from the standard of care in failing to recognize his signs and symptoms, and it was appropriate to treat him with a broad differential diagnosis.
The expert also states that the definitive way to diagnose hyperkalemia is through a comprehensive metabolic panel. The expert states that this test "was ordered and collected shortly after the patient's arrival" to the emergency department, and Dr. Edouard placed the order "as part of the initial orders placed at 9:45 p.m."
The expert further states that Decedent was placed on a cardiac monitor by 9:39 p.m., and this monitor "would have immediately alerted staff to any cardiac arrhythmias" prior to his cardiac arrest.
Finally, the expert states that calcium chloride and sodium bicarbonate were administered to Decedent during his cardiac arrest at approximately 10:32 p.m., which would treat hyperkalemia. (These medications were administered "prophylactically", according to the medical chart and statement of material facts, and "out of an abundance of caution" according to the expert.) He therefore opines that "all necessary actions were taken to treat the possibility of hyperkalemia while awaiting laboratory results."
The expert does not render any opinions as to proximate causation, except regarding asthma as a cause of death. As previously stated, Plaintiff does not oppose the part of the motion seeking to dismiss the asthma-related claims.
Based on evaluation of the submissions, the movant's expert failed to establish prima facie entitlement to summary judgment regarding Plaintiff's claims of delayed diagnosis and treatment of hyperkalemia. Firstly, the expert fails to address Plaintiff's claim of delayed [*9]treatment in the emergency department in any detail. Based on the testimony of Nurse Griffith and EMT Harvey, the expert suggests that the ambulance EMTs remained with the patient until approximately 9:24 p.m., when he was "transferred to an assigned bed." He states the hospital did not "assume care" of the patient until that point. However, there remain clear issues of fact based on the medical record alone as to when the patient was received by the emergency department and what accounted for the delay between his arrival and triage assessment.
The expert indicates that the EMTs failed to appropriately convey the urgency of Decedent's condition, but he does not articulate a standard of care for timely assessment and treatment on the part of the hospital staff. The absence of any discussion of these key facts from the record precludes summary judgment in favor of the movant Interfaith, as they have not eliminated issues of fact on Plaintiff's allegation of delayed diagnosis and treatment.
The expert also states in a conclusory manner that the comprehensive metabolic panel was timely "ordered and collected shortly after the patient's arrival." This fails to address in any detail the alleged delay of up to 45 minutes between his arrival, evaluation, and collection of the blood test. He also makes no mention of the standard of care for ordering routine or "stat"/emergent results in light of the patient's presentation. He states in a conclusory manner that calcium chloride was given "out of an abundance of caution," but the Court fails to see any discussion of the efficacy and timing of this medication while he was in active cardiac arrest.
Finally, the expert states that extremity numbness was the only symptom of hyperkalemia exhibited by Decedent. However, there remain at least issues of fact in the record as to whether he also complained of chest pain/chest tightness, as testified by Decedent's friend, and whether those complaints were properly recognized and documented.
Because the movant's expert opinion is conclusory, speculative, and not supported by the facts in the record, he fails to eliminate issues of fact and establish entitlement to summary judgment, regardless of the sufficiency of Plaintiff's opposition papers.
Notwithstanding, Plaintiff submits an expert affirmation in opposition from a licensed physician [name of expert redacted], who affirms they are board certified in internal medicine and have extensive experience as director of emergency medicine in a hospital setting. The Court was provided a signed, unredacted copy of the affirmation for in camera inspection, and the expert has laid a proper foundation to opine on the issues of this case, including the standard of care for emergency department physicians and staff.
Plaintiff's expert opines that Interfaith and Dr. Edouard departed from the standard of care by failing to timely transfer Decedent to a critical care bed, place him on a 12-lead EKG (rather than standard cardiac monitor), and obtain and process blood tests on an emergent basis.
The expert opines that it was a departure from the standard of care to delay any treatment or assessment of Decedent for at least 20 minutes after his arrival by ambulance. Following his initial triage intake, the expert further opines there was a delay in recognizing his critical condition (including hypotension, numbness, and unresponsiveness), and the standard of care required ordering a "stat" comprehensive blood panel and placing him on a 12-lead EKG to monitor changes in his heart activity more effectively than a cardiac monitor.
Plaintiff's expert also counters the statements of the movant's expert that Decedent did not exhibit various complaints associated with hyperkalemia (such as abdominal pain, diarrhea, or vomiting), opining that his extremity numbness alone was sufficient to include hyperkalemia in a differential diagnosis and order stat blood work. The expert also counters the movant's opinions that appropriate medications were administered "to address the possibility" of [*10]hyperkalemia. Plaintiff's expert opines that the standard of care required ten times the amount of calcium chloride he was given, rendering this medication during his code highly inadequate and delayed. They further opine the delay in diagnosis and treatment for hyperkalemia, including ordering a renal consultation and administering glucose and insulin, proximately caused his rapid deterioration, cardiac arrest, and death.
The movants did not meet their prima facie burden and shift the burden to Plaintiff's expert, and even if they had, Plaintiff's expert has raised issues of fact as to whether Dr. Edouard and Interfaith deviated from the standard of care in timely and properly evaluating and treating Decedent. Plaintiff also raised issues of fact as to whether those departures proximately caused Decedent's injuries and death, regardless of whether the movant had met their burden in the initial papers. For these reasons, Dr. Edouard and Interfaith's motion for summary judgment is granted to the extent of dismissing the unopposed claims related to diagnosis and treatment of asthma, and the claim for lack of informed consent, and the motion is otherwise denied.
Accordingly, it is hereby:
ORDERED that Dr. Edouard and Interfaith's motion (Seq. No. 5) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's Complaint against them is GRANTED TO THE EXTENT of dismissing Plaintiff's claims related to diagnosis and treatment of asthma, and dismissing Plaintiff's claim of lack of informed consent, and the motion is otherwise DENIED; and it is further
ORDERED that the City's motion (Seq. No. 6) for an Order, pursuant to CPLR 3211 (a) (7) or CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's Complaint against them on the basis of governmental function immunity, is GRANTED TO THE EXTENT of dismissing Plaintiff's withdrawn claims related to diagnosis and treatment of asthma and lack of informed consent, and the motion is otherwise DENIED.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.