**ESTATE OF GRAVES, Appellee,**

v.

**CITY OF CIRCLEVILLE et al., Appellants.**

[Cite as *Estate of Graves v. Circleville,* 179 Ohio App.3d 479, 2008-Ohio-6052.]

Court of Appeals of Ohio,
Fourth District, Ross County.

No. 06CA2900.

Decided Nov. 21, 2008.

Cooper & Elliott, L.L.C., Rex H. Elliott, Charles H. Cooper Jr., and Aaron D. Epstein; and J. Jeffrey Benson, for appellee.

Mazanec, Raskin, Ryder & Keller Co., L.P.A., John T. McLandrich, James A. Climer, and Frank H. Scialdone; and Gary D. Kenworthy, for appellants Peter Shaw, William J. Eversole, Benjamin E. Carpenter, and John and Jane Doe Officers of the Circleville Police Department.

---

HARSHA, Judge.

{¶ 1} The estate of Jillian Marie Graves (the "estate") sued Officers Peter Shaw, William Eversole, and Benjamin Carpenter (collectively, the "officers") of the Circleville Police Department for the death of Graves. The estate claims that the officers wantonly or recklessly released the vehicle of Cornelius Copley from impound without a court order. While intoxicated, Copley drove the vehicle and collided with Graves's vehicle, killing her. The trial court denied the officers' joint motion for summary judgment in which they argued that they were not liable under R.C. 2744.03(A)(6) because they owed no duty to Graves, did not act in a wanton or reckless manner, and were not the proximate cause of Graves's death.

{¶ 2} The officers argue that under the public-duty doctrine, which provides that a statutory duty owed only to the general public does not create a similar duty to an individual, the estate cannot demonstrate that they owed a duty to Graves. We disagree. While we agree that Ohio's common-law public-duty doctrine remains viable, we conclude that it does not apply to situations involving wanton or reckless conduct. The officers also contend that as a matter of law, their conduct was not reckless or wanton. Because the estate presented evidence that the officers knew or should have known that Copley had a history of driving while drunk and that his vehicle could not be released without a court order, a reasonable trier of fact could find that the officers acted in a wanton or reckless manner. Finally, the officers contend that as a matter of law, their conduct was not the proximate cause of Graves's death. Because the estate presented evidence that the officers knew or should have known that Copley habitually drove while drunk and on a suspended license, a reasonable trier of fact could find that Graves's death was the natural and probable consequence of the officers' conduct. Thus, we affirm the trial court's denial of the officers' motion for summary judgment.

## I. Facts

{¶ 3} On July 4, 2003, Officer Shaw arrested Copley for driving under the influence of alcohol ("DUI") and driving under suspension ("DUS"). In his deposition, Shaw admitted that he knew that proper procedure required a court order to release a vehicle to a person with (1) a charge of DUI and a prior DUI conviction[1] or (2) a charge of driving under a suspended license. In his deposition, Shaw stated that at the scene of the arrest, Copley told him that he drove without a license because the court suspended it due to a prior DUI violation. Despite receiving this information, Shaw failed to remove Copley's license plates and send them to the BMV, failed to make sure the paperwork clearly stated that no one could release Copley's car from the impound lot until a court ordered the release, failed to properly complete the BMV immobilization form by not indicating that the car's license plates were to be removed, and failed to inform the dispatcher that no one could release Copley's vehicle from the impound lot without a court order. Prior to the vehicle's release, Shaw checked Copley's LEADS report showing Copley's license suspension and lengthy DUI history. Shaw took no steps to ensure that Copley's vehicle was not released. After Shaw learned that someone had released the vehicle to Copley without a court order, he failed to do anything to secure the vehicle's return.

---

1. A court order is required only if the conviction occurred within the last six years of the current DUI charge. It is unclear whether Shaw knew of this limitation. However, based on the record, it is clear that Copley had a conviction within six years of his arrest by Shaw.

{¶ 4} Officer Eversole released Copley from jail. In his deposition, Eversole admits that at the time of release, he knew that an officer had arrested Copley for DUI and DUS. He further admitted that he knew that proper procedure required a court order to release a vehicle to a person with (1) a charge of DUI and a prior DUI conviction within the last six years, or (2) a charge of driving under a suspended license. Regardless, without a court order, Eversole gave Copley his keys to the vehicle. Though Eversole claims that he had no further involvement with Copley after his release, Copley's sister, Carolyn Brewer, states otherwise. Following his release, Copley went home for a short period of time. Then Brewer and Totie Rhodes, Copley's niece by marriage, accompanied him to the Circleville police station so he could obtain a release form to retrieve his car from the impound lot. After Copley received the form and they prepared to pull out from the station, an officer approached Copley's window. Rhodes recalls the officer stating, "Now, don't be going out and getting in that car and drinking and kill someone." Brewer similarly recalls the officer telling Copley, "[D]on't take that car out and kill somebody tonight." Brewer identified the officer as Eversole.

{¶ 5} Dispatcher Carpenter wrote "no hold" on Copley's vehicle release form and authorized the release of Copley's car by signing his name on the form. Carpenter testified at his deposition that after reading the police department's standard operating procedures, he signed his name to indicate he had read them. He understood that there were certain circumstances under which vehicles would be impounded and could not be released until the suspect had appeared in court. However, he further testified, "[U]ntil this situation [arose], I didn't understand how vehicles are held for suspensions and DUI's." He stated, "I'd usually just wait for the officers to tell me what they needed as far as putting a hold on it or not." Carpenter printed out Copley's "lengthy" LEADS report, involving the history of Copley's criminal record, and was "sure he glanced at it" to find out what Copley's history was. Carpenter knew that an officer had arrested Copley for DUI, but failed to contact the officer before signing off to release the vehicle; he knew Copley did not have a valid driver's license; and he knew Copley had not yet appeared in court.

{¶ 6} After Copley retrieved his vehicle on the afternoon of July 5, 2003, and while intoxicated, Copley drove the wrong way on U.S. Route 23 in the early morning hours of July 6, 2003. He collided head-on with a vehicle driven by Jillian Marie Graves, killing her.

{¶ 7} The estate brought an action against the city of Circleville ("city"), John and Jane Doe Officers of the Circleville Police Department, and others. In the original complaint, the estate alleged causes of action for negligence, wrongful death, Graves's pain and suffering before her death, and respondeat superior.

The estate amended its complaint to include allegations that the defendants acted wantonly, recklessly, and with complete disregard for the foreseeable consequences of their actions. After the city moved the trial court for judgment on the pleadings, the trial court found that the city and its officers were engaged in a governmental function and were, thus, immune from liability for their actions under R.C. 2744.02(A)(1). Accordingly, the court granted the city and John and Jane Doe Officers judgment on the pleadings and dismissed the estate's amended complaint.[2] We affirmed the court's dismissal of the city, but reversed the dismissal of the John and Jane Doe Officers and remanded this cause to the trial court for further proceedings. *Estate of Graves v. Circleville*, Ross App. No. 04CA2774, 2005-Ohio-929, 2005 WL 503372.

{¶ 8} On remand, the estate amended its complaint a second time and added three defendants: Officer Peter Shaw, Officer William Eversole, and Officer Ben Carpenter. After several depositions, the officers sought summary judgment, claiming immunity from any liability. When the court denied the officers' motion, they filed this appeal. *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, provides that such a judgment constitutes a final, appealable order.

## II. Assignment of Error

{¶ 9} Appellants present one assignment of error:

The lower court erred in denying the appellants/individual officers' joint motion for summary judgment because they are immune and appellee failed to establish a relevant exception to their immunity.

## III. Standard of Review

{¶ 10} When reviewing a trial court's decision on a summary-judgment motion, an appellate court conducts a de novo review. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Accordingly, an appellate court must independently review the record to determine whether summary judgment was appropriate and does not defer to the trial court's decision. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.

{¶ 11} Summary judgment is appropriate when the movant has established: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party, with the evidence against that party being construed most strongly in its favor. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881.

---

2. The unnamed officers (identified as John and Jane Doe Officers) did not move for judgment on the pleadings.

{¶ 12} The burden of showing that no genuine issue of material fact exists falls upon the party who moves for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 662 N.E.2d 264. However, once the movant supports the motion with appropriate evidentiary materials, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). See also *Dresher* at 294–295, 662 N.E.2d 264.

## IV. The Existence of a Duty to Ms. Graves

{¶ 13} In their sole assignment of error, the officers contend that they are immune from liability. The estate acknowledges that the officers have immunity in certain circumstances, but asserts that the officers have confused the concepts of duty and immunity. The estate contends that the officers are not immune here because their conduct was wanton or reckless under R.C. 2744.03(A)(6)(b), which provides:

> In a civil action brought against * * * an employee of a political subdivision to recover damages for injury, death, or loss to person * * * allegedly caused by any act or omission in connection with a governmental or proprietary function * * * the employee is immune from liability unless one of the following applies * * * [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.

{¶ 14} Relying upon the doctrine of law of the case, the estate initially argues that the officers cannot raise the issue of duty or proximate cause because they failed to do so in the prior appeal. Because the prior appeal did not involve a motion for summary judgment (it involved a judgment on the pleadings) and because the officers were not yet named parties, we disagree.

{¶ 15} The officers contend that we should not reach the "wanton or reckless" issue because the estate failed to show that the officers owed a duty to Graves. The officers correctly point out that before there can be any liability in tort, the plaintiff must establish that the injury resulted from a failure to discharge a duty owed by the defendant to the injured party. See *Moncol v. Bd. of Edn. of N. Royalton School Dist.* (1978), 55 Ohio St.2d 72, 75, 9 O.O.3d 75, 378 N.E.2d 155. However, we agree with the estate that the public-duty doctrine does not deal with questions of immunity. The application of immunity implies the existence of a duty. Immunity represents the freedom or exemption from a penalty, burden, or duty. See Black's Law Dictionary (Abridged 6th Ed.1991) 515. Immunity serves to protect a defendant from liability for a breach of an otherwise enforceable duty to the plaintiff. On the other hand, the public-duty

doctrine asks whether there was an enforceable duty in the first place. *Zimmerman v. Skokie* (1998), 183 Ill.2d 30, 46, 231 Ill.Dec. 914, 697 N.E.2d 699.

{¶ 16} In any event, the estate claims that the officers breached the duties owed to Graves established by R.C. 4507.38 and 4511.195. At the time of Copley's arrest, R.C. 4507.38(B)(1) required a law-enforcement agency arresting a person for driving without a valid license to seize the vehicle and plates and hold them at least until the operator's initial court appearance.[3] R.C. 4511.195 provides that when arresting a person for driving under the influence of alcohol who had been convicted of a similar offense within the six previous years, a law-enforcement agency must seize the vehicle the person was operating at the time of the alleged offense and its license plates. The law-enforcement agency must hold the vehicle at least until the operator's initial court appearance. R.C. 4511.195(B)(2).

{¶ 17} However, the officers assert that any duty they allegedly breached under R.C. 4507.38 and 4511.195 was owed to the public at large and not to any individual. This defense, known as the public-duty rule or doctrine, prevents an individual from establishing the existence of a duty to the individual when the law imposes the duty simply for the benefit of the public at large. Because the existence of a duty presents a question of law, *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, we conduct a de novo review of this issue. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684.

{¶ 18} The Supreme Court of Ohio officially recognized the public-duty doctrine in *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468. *Sawicki* arose from events that occurred after the court judicially abrogated sovereign immunity for municipal corporations but before the legislature responded by enacting the Political Subdivision Tort Liability Act, codified in R.C. Chapter 2744. Id. at 225, 525 N.E.2d 468. Under the public-duty doctrine, "[w]hen a duty which the law imposes on a public official is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, is generally a public and not an individual injury." *Sawicki* at paragraph two of the syllabus. Notably, the *Sawicki* court found that the doctrine was "obscured by, yet was coexistent at common law with, the doctrine of sovereign immunity." Id. at 230, 525 N.E.2d 468. "Rather than being an absolute defense, as was sovereign immunity, the public-duty rule comported with the principles of negligence, and was applicable to the determination of the extent to which a statute may encompass the duty upon which negligence is premised." Id.

---

3. R.C. 4507.38 has since been amended by Am.Sub.S.B. 123 and recodified in R.C. 4510.41.

{¶ 19} At common law, states formulated exceptions to the public-duty doctrine. Many jurisdictions recognize a "special duty" or "special relationship" exception. See *Sawicki,* 37 Ohio St.3d at 231, 525 N.E.2d 468; *Ezell v. Cockrell* (Tenn.1995), 902 S.W.2d 394, 401. But as the Tennessee Supreme Court notes, the "test varies from jurisdiction to jurisdiction." *Ezell* at 401. For example, in Tennessee, a special duty exists in three instances. Id. at 402. Connecticut recognizes at least four exceptions to the public-duty doctrine. *Shore v. Stonington* (1982), 187 Conn. 147, 153–155, 444 A.2d 1379.

{¶ 20} The Supreme Court of Ohio adopted New York's formulation of the special-relationship exception, which requires four elements: " '(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.' " *Sawicki,* 37 Ohio St.3d at 232, 525 N.E.2d 468, quoting *Cuffy v. New York* (1987), 69 N.Y.2d 255, 260, 513 N.Y.S.2d 372, 505 N.E.2d 937. "If a special relationship is demonstrated, then a duty is established, and inquiry will continue into the remaining negligence elements." Id. at 230, 525 N.E.2d 468. Implicitly, this includes any analysis of whether an immunity exists to protect the defendant from any otherwise enforceable duties.

{¶ 21} The officers argue that the public-duty doctrine remains viable after the adoption of R.C. Chapter 2744, and we agree. Unlike the events giving rise to *Sawicki,* the events in this case arose after Ohio's Political Subdivision Tort Liability Act took effect. Once the act took effect, the public-duty doctrine's continued validity became questionable. Several appellate courts decided that the legislation superseded the doctrine. See, e.g., *Franklin v. Columbus* (1998), 130 Ohio App.3d 53, 59–60, 719 N.E.2d 592; *Sudnik v. Crimi* (1997), 117 Ohio App.3d 394, 397, 690 N.E.2d 925; *Amborski v. Toledo* (1990), 67 Ohio App.3d 47, 51, 585 N.E.2d 974; *Kendle v. Summit Cty.* (Apr. 15, 1992), Summit App. No. 15268, 1992 WL 80074.

{¶ 22} Granted, the Supreme Court of Ohio has not expressly overruled this line of cases. See *Wallace v. Ohio Dept. of Commerce, Div. of State Fire Marshal,* 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, fn. 13. However, in dicta, the court has stated that the doctrine "remains viable as applied to actions brought against political subdivisions pursuant to R.C. Chapter 2744." *Yates v. Mansfield Bd. of Edn.,* 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861, fn. 2. In its most recent discussion of the doctrine, the court found that the special-relationship exception to the public-duty doctrine did not constitute an independent exception to political subdivision immunity in the context of negli-

gence actions. *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521. The court stated, however, if the facts implicate one of the five enumerated exceptions to immunity in R.C. 2744.02(B), the public-duty doctrine might be "relevant in establishing a claim." Id. at ¶ 32. In other words, whether a duty exists at all. This is especially so given the Supreme Court's explicit statement in *Sawicki* that immunity and the public-duty doctrine were separate, coexisting concepts. While the doctrine is a judicially created rule and the Supreme Court may yet abrogate it, we are not so bold. Thus, we are reluctant to find that the doctrine is no longer viable.

{¶ 23} Canons of statutory construction support the continued viability of the public-duty doctrine. "The General Assembly is presumed to know the common law when enacting legislation." *Walden v. State* (1989), 47 Ohio St.3d 47, 56, 547 N.E.2d 962 (Resnick, J., concurring in part and dissenting in part), citing *Davis v. Justice* (1877), 31 Ohio St. 359, 364. "[T]he General Assembly will not be presumed to have intended to abrogate a common-law rule unless the language used in the statute clearly shows that intent." *Carrel v. Allied Prods. Corp.* (1997), 78 Ohio St.3d 284, 287, 677 N.E.2d 795, citing *State ex rel. Morris v. Sullivan* (1909), 81 Ohio St. 79, 90 N.E. 146, paragraph three of the syllabus. "There is no repeal of the common law by mere implication." Id., quoting *Frantz v. Maher* (1957), 106 Ohio App. 465, 472, 7 O.O.2d 209, 155 N.E.2d 471. Because the legislature had authority to abrogate the common-law public-duty doctrine in R.C. Chapter 2744 and did not expressly do so, we conclude that the Ohio common-law public-duty doctrine as outlined in *Sawicki* remains viable.

{¶ 24} The officers contend that the public-duty doctrine precludes their liability because the estate relies upon general statutory provisions to create the officers' duties. Therefore, the officers argue that the estate's claims can proceed only if it establishes the special-relationship exception, which, we acknowledge, it cannot. However, we do not agree with the officers' contention that the estate cannot proceed with its claims. While it remains viable, the public-duty doctrine was never intended to preclude liability for the wanton or reckless acts of rogue employees. There are good policy reasons for protecting public employees from liability when they act in good faith in performing their duties but do so negligently. The same cannot be said of rogue employees whose egregious conduct causes harm to individual citizens.

{¶ 25} We conclude that Ohio's public-duty doctrine does not apply to wanton or reckless conduct. Both Tennessee and Connecticut recognize that a "special duty" exists when the complaint alleges a cause of action involving malice, intent, or wantonness/recklessness. *Ezell*, 902 S.W.2d 394, 402; *Shore*, 187 Conn. at 155, 444 A.2d 1379. Rhode Island recognizes an "egregious conduct" exception separate and apart from its "special duty" exception. See

*L.A. Ray Realty v. Cumberland Town Council* (R.I.1997), 698 A.2d 202.  Like a finding of negligence, a finding of wanton or reckless conduct requires a showing of duty.  However, the *Sawicki* court noted that the public-duty doctrine "comported with principles of *negligence.*"  (Emphasis added.)  *Sawicki,* 37 Ohio St.3d at 230, 525 N.E.2d 468.  In *Universal Concrete Pipe Co. v. Bassett* (1936), 130 Ohio St. 567, 5 O.O. 214, 200 N.E. 843, the Supreme Court of Ohio distinguished wanton conduct from negligence.  The court found the term "wanton negligence" to be a misnomer and the difference between the concepts to be "one of kind, not merely of degree."  Id. at 573–575, 5 O.O. 214, 200 N.E. 843. Given this distinction between wanton or reckless conduct and negligence, along with the *Sawicki* court's implicit limiting of the public-duty doctrine to negligence, we believe that the public-duty doctrine is not applicable to shield a rogue employee from wanton or reckless conduct.  We have found no Ohio precedent that has allowed a government employee to escape liability for wanton or reckless conduct based on the public-duty rule.  All the Ohio caselaw is restricted to applying the public-duty rule in the context of negligence, not wanton or reckless acts.  Thus, we conclude that the trial court properly denied the officers' motion for summary judgment.  R.C. 4507.38 and 4511.195 may have created a duty to Graves in this case, depending upon the factual determination of whether the officers' conduct was reckless or wanton.

{¶ 26} Alternatively, if the common-law public-duty rule does in fact apply to wanton or reckless conduct, we conclude that the enactment of R.C. 2744.03(A)(6)(b) amounts to a clear legislative repudiation of that segment of the doctrine.  In other words, while there is no clear abrogation of the doctrine in the negligence context, the same cannot be said for wanton or reckless conduct.  The legislature has explicitly provided in R.C. 2744.03(A)(6)(a) and (b) that rogue employees who act manifestly outside the scope of their employment, or act maliciously, in bad faith, or in a reckless or wanton manner, are subject to liability.  Under the current statutory scheme, employees who are merely negligent maintain their immunity absent an express imposition of civil liability in a separate section of the Revised Code. See R.C. 2744.03(A)(6)(c).  The scheme set forth in R.C. 2744.03(A)(6) could be interpreted as a statement of the legislature's clear intent to provide for the public-duty doctrine's continued viability in the negligence context, while repudiating it when dealing with rogue employees.  Accordingly, we reject the officers' arguments concerning their lack of duty to Graves.  Of course, the estate must still prevail on the issues of breach, causation, and damages.

## V.  Wanton or Reckless Conduct

{¶ 27} The officers next argue that as a matter of law, their conduct was not wanton or reckless.  Generally, whether conduct is wanton or reckless

presents a question of fact for the jury. See *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31. In *Rankin*, the Supreme Court of Ohio outlined its definitions of the terms "reckless" and "wanton":

> "This court has defined the term 'reckless' to mean that the conduct was committed ' "knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." ' " *Cater* [*v. Cleveland* (1998) ], 83 Ohio St.3d [24,] 33, 697 N.E.2d 610, quoting *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 96, 559 N.E.2d 699, fn. 2, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500. " '[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.' Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." *Fabrey* [at 356], 639 N.E.2d 31, quoting *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 96–97, 55 O.O.2d 165, 269 N.E.2d 420.

*Rankin*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶ 37.

{¶ 28} Construing the evidence most strongly in favor of the estate, we examine the conduct of each officer in turn.

### A.   Officer Peter Shaw

■ {¶ 29} The estate contends that Officer Shaw acted in a wanton or reckless manner when he failed to ensure that Copley's vehicle would not be released without a court order and failed to take any steps to retrieve the vehicle after its premature release. Shaw admitted in his deposition that when he arrested Copley for DUI and DUS, he knew that Copley's license had been suspended due to a prior DUI violation. Shaw knew that under those circumstances, Copley's vehicle could not be released without a court order. Yet Shaw did nothing to ensure that Copley's vehicle would not be released without a court order. Even after reviewing Copley's lengthy DUI history on the LEADS report, Shaw did nothing to prevent Copley from retrieving the vehicle. Upon learning that Copley had in fact retrieved the vehicle, Shaw did nothing to secure its return.

{¶ 30} Construing all the evidence presented in favor of the estate, it is apparent that reasonable minds could reach different conclusions regarding whether Shaw acted in a wanton or reckless manner. Based on Shaw's knowledge of Copley's suspended license, extensive DUI record, and most recent arrest for DUI, we find that reasonable minds could conclude that Shaw was aware of facts that would lead a reasonable person to realize not only that allowing Copley to access his vehicle without court permission created an unreasonable risk of

physical harm to others on the roadway, but also that such a risk was substantially greater than that which was necessary to make his conduct negligent. Reasonable minds could likewise conclude that given Copley's propensity to drive under the influence, Shaw must have been conscious that his failure to follow the impound procedure would in all probability result in injury.

## B. Officer William Eversole

{¶ 31} The estate contends that Officer Eversole acted in a wanton or reckless manner when he failed to ensure that Copley's vehicle would not be released without a court order. Eversole knew that Copley was arrested on July 4, 2003, for DUI and DUS. He knew that proper procedure required a court order to release a vehicle to a person with (1) a charge of DUI and a prior DUI conviction within the last six years or (2) a charge of driving under a suspended license. So he should have known that Copley's vehicle could not properly be released without a court order.

{¶ 32} Although Eversole recalls no contact with Copley after his release, Carolyn Brewer offered a different version of events in her deposition. Brewer's testimony is supported by the deposition testimony of Totie Rhodes. Copley went home for a period of time after his release. He returned to the police station to obtain the release form to get his car from the impound lot. Brewer and Rhodes accompanied him to the station. Both women recall an officer approaching Copley's car window as they prepared to leave the station. Rhodes recalls the officer stating, "Now, don't be going out and getting in that car and drinking and kill someone." Brewer similarly recalls the officer telling Copley, "[D]on't take that car out and kill somebody tonight." Brewer identified the officer as Eversole.

{¶ 33} While it is unclear from Eversole's deposition testimony whether he knew that Copley's vehicle had not been properly impounded, a reasonable jury could conclude that he did, based on Brewer's testimony. Construing all the evidence presented in favor of the estate, it is apparent that reasonable minds could reach different conclusions regarding whether Eversole acted in a wanton or reckless manner. Based on Officer Shaw's knowledge of the charges, knowledge that the vehicle had not been properly impounded, and concern that Copley would kill someone with the vehicle, we find that reasonable minds could conclude that Eversole was aware of facts that would lead a reasonable person to realize not only that allowing Copley to have access to his vehicle without court permission created an unreasonable risk of physical harm to others on the roadway, but also that such a risk was substantially greater than that which was necessary to make his conduct negligent. Reasonable minds could likewise conclude that in light of Eversole's verbalized concern that Copley would kill

someone with the car, Eversole must have been conscious that his failure to follow the impound procedure would in all probability result in injury.

### C. Dispatcher Benjamin Carpenter

{¶ 34} The estate contends that Dispatcher Carpenter acted in a wanton or reckless manner when he wrote "no hold" on Copley's vehicle-release form and authorized the release of the vehicle by signing his name to the form. Carpenter knew that Copley had been arrested for DUI and DUS. Carpenter acknowledged reading the department's standard operating procedures and knowing that there were circumstances under which a vehicle could not be released from impound until the suspect appeared in court and received a court order. But he testified, "[U]ntil this situation [arose], I didn't understand how vehicles are held for suspensions and DUI's." He stated, "I'd usually just wait for the officers to tell me what they needed as far as putting a hold on it or not." Carpenter printed out Copley's "lengthy" LEADS report, involving the history of Copley's criminal record. He was "sure he glanced at it" to find out what Copley's history was. Carpenter knew that an officer had arrested Copley for DUI, but failed to contact the officer before signing off to release the vehicle; he knew Copley did not have a valid driver's license; and he knew Copley had not yet appeared in court.

{¶ 35} Construing all the evidence presented in favor of the estate, it is apparent that reasonable minds could reach different conclusions regarding whether Carpenter acted in a wanton or reckless manner. The estate presented evidence that Carpenter knew of the charges, knew of Copley's criminal record, and should have known the department's procedures for impounding vehicles. Based on this evidence, we find that reasonable minds could conclude that Carpenter was aware of or should have been aware of facts that would lead a reasonable person to realize not only that allowing Copley to have access to his vehicle without court permission created an unreasonable risk of physical harm to others on the roadway, but also that such a risk was substantially greater than that which was necessary to make his conduct negligent. Reasonable minds could likewise conclude that in light of this evidence, Carpenter must have been conscious that ignoring proper impound procedure would in all probability result in injury.

### VI. Proximate Cause

{¶ 36} The officers next argue that as a matter of law, their conduct was not the proximate cause of Graves's death. "Ordinarily, proximate cause is a question of fact for the jury." *Aldridge v. Reckart Equip. Co.*, Gallia App. No. 04CA17, 2006-Ohio-4964, 2006 WL 2716696, ¶ 79. "However, 'where no facts are alleged justifying any reasonable inference that the acts or failure of the

defendant constitute the proximate cause of the injury, there is nothing for the jury [to decide], and, as a matter of law, judgment must be given for the defendant.'" Id., quoting *Case v. Miami Chevrolet Co.* (1930), 38 Ohio App. 41, 45–46, 175 N.E. 224.

{¶ 37} "The rule of proximate cause 'requires that the injury sustained shall be the natural and probable consequence of the [breach of duty] alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his [breach].'" *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 143, 539 N.E.2d 614, quoting *Ross v. Nutt* (1964), 177 Ohio St. 113, 114, 29 O.O.2d 313, 203 N.E.2d 118.

[19–21] {¶ 38} "[I]n order to establish proximate cause, foreseeability must be found." *Mussivand,* 45 Ohio St.3d at 321, 544 N.E.2d 265. "In determining whether an intervening cause 'breaks the causal connection between [breach of duty] and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the [breach]. If an injury is the natural and probable consequence of a [breach of duty] and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the [breach]. It is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in an injury to someone.'" (Citations omitted.) Id. at 321, 544 N.E.2d 265, quoting *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 39, 41 O.O. 117, 90 N.E.2d 859.

{¶ 39} The officers attempt to analogize this case to police pursuit cases in which courts have found that unless an officer acted in an extreme and outrageous manner, he is not the proximate cause of injuries to a third party struck by a vehicle fleeing from the officer. See, e.g., *Lewis v. Bland* (1991), 75 Ohio App.3d 453, 599 N.E.2d 814. We do not believe the situations are analogous. The decisions in police pursuit cases are based on the policy that "[t]he duty of police officers is to enforce the law and to make arrests in proper cases, not to allow one being pursued to escape because of the fear that the flight may take a course that is dangerous to the public at large." Id. at 456, 599 N.E.2d 814, quoting *Nevill v. Tullahoma* (Tenn.1988), 756 S.W.2d 226, 232. This policy consideration is not at issue when police have already impounded a vehicle and all that remains is to determine if and when that vehicle should be released.

{¶ 40} In this case, the officers failed to ensure that Copley's vehicle remained impounded until released by court order. In doing so, they gave a habitual drunk driver, known to drive on a suspended license, access to his vehicle without a judicial determination that it was safe to do so. The officers argue that Copley's

conduct was the superseding/intervening cause of Graves's death. However, we do not believe that Graves's death at Copley's hand was so remote that tort jurisprudence will excuse the officers' conduct as a matter of law. Under the circumstances, it was reasonably foreseeable that Copley would drive his vehicle drunk, cause an accident, and injure or kill another driver. A reasonable trier of fact could find that Graves's death was the natural and probable consequence of the officers' premature release of Copley's vehicle. Thus, denial of the officers' joint motion for summary judgment was appropriate. Therefore, we overrule the officers' sole assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

ABELE, P.J., concurs.

KLINE, J., dissents.

KLINE, Judge, dissenting.

{¶ 41} I respectfully dissent.

{¶ 42} The facts of this case are truly unfortunate. There really is no dispute that the acts and/or omissions of the officers involved were contrary to law and that the death of Graves likely could have and, ultimately, should have been avoided. However, reluctantly, I cannot agree that under Ohio law, an exception to the public-duty rule exists for willful, wanton, or reckless conduct by virtue of R.C. 2744.03(A)(6)(b), or by virtue of the existence of such an exception at common law. While the public-duty rule initially arose from the principles of negligence, *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 230, 525 N.E.2d 468, the Supreme Court of Ohio has also noted that when the public-duty rule applies, there is no need to determine whether an officer is entitled to immunity, i.e., whether the officer's conduct was merely negligent or whether his conduct was willful or wanton. See *Wallace v. Ohio Dept. of Commerce, Div. of State Fire Marshal*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 31, fn. 9.

{¶ 43} As a result, because the statutes involved herein create duties owed to the public at large, and not to certain individuals, I would find that the public-duty rule applies and the officers cannot be held liable for their allegedly wanton, willful, or reckless conduct absent a duty owed to Graves individually. When no legal duty is owed, there is no actionable tort. See 88 Ohio Jurisprudence 3d., Torts, Section 3.