

FILED

May 26 2016, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Christopher D. Wyant<br>Indianapolis, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Frances Barrow<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Doe #1, et al.,<br><br>*Appellants-Plaintiffs,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Defendant.* | May 26, 2016<br><br>Court of Appeals Case No.<br>49A02-1506-CT-682<br><br>Appeal from the Marion Superior Court<br><br>The Honorable John F. Hanley, Judge<br><br>Trial Court Cause No.<br>49D11-1404-CT-11045 |

**Altice, Judge.**

## Case Summary

[1] John Doe #1 (Doe) and his family, wife – Jane Doe #1, two young adult sons – John Doe #2 and John Doe #3, and minor daughter – Jane Doe #2, filed a civil action against the Indiana Department of Child Services (DCS) alleging negligence in failing to protect Doe's identity as the reporting source of

suspected child neglect. Although acknowledging that the disclosure violated Ind. Code § 31-33-18-2, DCS filed a motion for summary judgment arguing that the statue did not provide for a private right of action. The trial court granted summary judgment in favor of DCS and dismissed the action with prejudice. On appeal, the Does argue that summary judgment was improperly granted because DCS owed Doe a duty to maintain confidentiality under both the statute and common law.

We reverse and remand.

## Facts & Procedural History[1]

The Does live in the small town of Oolitic and have lived at the same address for about ten years.[2] They are actively involved in their church, and Doe drives a church bus that regularly takes children in the neighborhood to church events. As a result of his involvement with many of these children, as well as incidents he witnessed in the neighborhood, Doe came to believe that children in various homes were being neglected. In late June 2013, Doe spoke to his wife about his concerns, which she shared, and she reluctantly agreed that Doe should make a report to DCS.

---

[1] We heard oral argument in this case on April 21, 2016, at Martin University. We would like to thank the students, faculty, and administration of the school for their professionalism and hospitality, and we commend counsel for the quality of their presentations.

[2] Doe and his wife separated for a brief period prior to the events relevant to this case. Between June 2012 and May 2013, Doe remained in the home while the other members of the family moved into an apartment. Doe and his wife began rekindling their relationship around January 2013.

[4] Doe called the DCS hotline to report his suspicions that children in five homes on his street were in need of services due to dangerous living situations. Doe believed the adult subjects of his report were involved in drugs or other criminal activities and were associated with serious and violent criminals. When he was about to end the call, the DCS employee asked for his name and phone number. Doe expressed reluctance and indicated that he did not want anyone to know that he had called. The employee responded that the information was confidential and nobody would find out that he made the report. Doe then agreed to give his first name and phone number, but not his last name. Of course, DCS also had the name of the street on which he lived.

[5] About a week later, on July 3, 2013, Doe was confronted in his front yard by Heather Ditton, who lived across the street and was one of the neighbors Doe reported. While screaming and yelling obscenities, Ditton angrily accused Doe of calling DCS. Ditton had in her possession an unredacted copy of the DCS report, which identified Doe as the reporting source. Other neighbors quickly became aware of the report Doe made. Upon realizing the report was not kept confidential, Doe felt like "somebody ripped [his] heart out." *Appellants' Appendix* at 46.

[6] From that point on, the Doe family no longer felt comfortable outside their house. They wanted to relocate but could not afford to move. Doe indicated that he was "stared at, glared at, mooned, flipped off, yelled at, you know, every day, forever." *Id*. at 45. His daughter, Jane Doe #2, was bullied by other children. Both Doe and his wife missed work due to stress and lack of sleep.

Although not present for the initial confrontation with Ditton, Doe's wife was screamed at and threatened by Ditton on subsequent occasions. For example, Ditton threatened that she was going to "kick [Jane Doe #1's] ass" and "cut that smirky grin off [her] face". *Id.* at 65.

On April 4, 2014, the Does filed a complaint for damages against DCS. The complaint alleged that DCS was negligent in failing to protect Doe's identity. DCS filed for summary judgment on March 11, 2015, arguing that the Does had no private right of action to bring a claim for violation of I.C. § 31-33-18-2.[3] The Does responded to the motion for summary judgment and argued that DCS owed a duty under the statute and common law. Following a hearing, the trial court summarily granted summary judgment in favor of DCS on May 28, 2015. The Does now appeal.

## Standard of Review

On appeal, we apply the same standard applicable to the trial court: summary judgment may be granted only where the designated evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. T.R. 56(C); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences are construed in favor of the non-moving party. *Mangold*, 756 N.E.2d at 973.

---

[3] Alternatively, DCS briefly argued that it did not owe a duty to Doe's family because their identities were not disclosed and that none of the Does could establish compensable damages. DCS does not reassert these arguments on appeal.

Although summary judgment is a desirable tool to allow the trial court to dispose of cases where only legal issues exist, our Supreme Court has recognized that it is also a blunt instrument that prevents a party from having his or her day in court. *See Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

[9] Summary judgment is appropriate when the undisputed material evidence negates at least one element of a claim. *Estate of Mintz v. Connecticut Gen. Life Ins. Co.*, 905 N.E.2d 994, 998 (Ind. 2009). In negligence cases, the determination of whether a duty exists is generally a question of law. *Rhodes v. Wright*, 805 N.E.2d 382, 386 (Ind. 2004). The existence of a duty, however, may depend on underlying facts that require resolution by the trier of fact. *Id.*

## Discussion & Decision

[10] The parties present us with an issue of first impression: whether I.C. § 31-33-18-2 confers a private right of action for a violation of DCS's statutory duty to protect a reporter's identity. I.C. § 31-33-18-2 provides in relevant part that reports shall be made available to:

> (8) Each parent, guardian, custodian, or other person responsible for the welfare of a child named in a report or record…*with protection for the identity of reporters and other individuals.*
>
> ****
>
> (14) A person about whom a report has been made, *with protection for the identity of*:

(A)     *any person reporting known or suspected child abuse or neglect*; and

(B)     *any other person if the person or agency making the information available finds that disclosure of the information would be likely to endanger the life or safety of the person.*

**** 

(Emphases supplied.)  Thus, the statute requires redaction of DCS reports before they are provided to certain individuals, like Ditton.  DCS does not dispute this and acknowledges that its own policy manual and written code of conduct require confidentiality.  While the disclosure of Doe's identity clearly violated the statute, DCS argues that the statute does not confer a private right of action.

[11]  Not every breach of a statutory duty provides plaintiffs with a right of action.  The legislature must have intended the violation to give rise to a negligence action.  Where, as in this case, the statute does not expressly provide for a private right of action to enforce the statutory duty, we look to whether the legislature intended for a private right of action to be implied.  *See Blanck v. Ind. Dep't of Correction*, 829 N.E.2d 505, 509 (Ind. 2005).  A private cause of action may be inferred where a statute imposes a duty for a particular individual's benefit but will not be where the legislature imposes a duty for the public's benefit.  *Id.*  But even where a duty benefits an individual, we will not infer a private right of action where it is clear that the legislature did not intend one.  *See id.* at 510.  "[T]he fact that an individual suffers a distinct injury unique

from the general public is not determinative." *Americanos v. State*, 728 N.E.2d 895, 897 (Ind. Ct. App. 2000), *trans. denied*. "Rather, it is legislative intent, as construed from the provisions of the statute, which determines whether a private cause of action is available." *Id*.

[12] The parties dispute whether the legislature intended to hold DCS civilly liable for damages resulting from the violation of I.C. § 31-33-18-2's confidentiality requirements. We leave this issue for another day because on the specific facts before us, we conclude that DCS owed Doe a private duty based on the common law.

[13] The existence of a duty is a question of law for the court. *Mullin v. Mun. City of South Bend*, 639 N.E.2d 278, 285 (Ind. 1994). In determining whether a duty exists, three factors must be balanced: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). Where a plaintiff seeks recovery against a governmental entity for negligence, the relationship between the parties must be one that gives rise to a private duty owed to a particular individual. *Mullin*, 639 N.E.2d at 285 (addressing the distinction between a duty owed to the public at large and a duty owed to a particular individual).

[14] In the context of a governmental entity's dispatch of emergency services, our Supreme Court has applied the *Webb* factors and set out three elements for imposition of a private duty: (1) an explicit assurance by the municipality

(through promises or actions) that it would act on behalf of the injured party; (2) knowledge on the part of the municipality that inaction could lead to harm; and (3) justifiable and detrimental reliance by the injured party. *Kohler v. Dial*, 653 N.E.2d 524, 526 (Ind. Ct. App. 1995) (private duty found where 911 dispatcher promised caller that an ambulance would be dispatched immediately but no dispatch followed), *trans. denied*; *Mullin*, 639 N.E.2d at 283-85 (adopting test but finding no private duty where neighbor called 911 about fire at plaintiffs' house and no assurance was made that an ambulance would be dispatched with the fire trucks and there was no evidence of detrimental reliance by plaintiffs). Notably, this test does not require direct contact between the municipality's agent and the injured party. *Mullin*, 639 N.E.2d at 284.

[15]  In establishing the test for imposition of a private duty on a governmental defendant, the Court in *Mullin* emphasized that more is required than a foreseeable plaintiff with a foreseeable injury. Indeed, *Webb* requires that the relationship between the parties and public policy concerns be addressed. The Court quoted *Cuffy v. City of New York*, 505 N.E.2d 937 (N.Y. 1987), as follows:

> [T]he injured party's reliance is as critical in establishing the existence of a special relationship as is the municipality's voluntary affirmative undertaking of a duty to act. That element provides the essential causative link between the "special duty" assumed by the municipality and the alleged injury. Indeed, at the heart of most of these "special duty" cases is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of

> protection. On the other hand, when the reliance element is
> either not present at all or, if present, is not causally related to the
> ultimate harm, this underlying concern is inapplicable, and the
> invocation of the "special duty" exception is then no longer
> justified.

*Mullin*, 639 N.E.2d at 284 (quoting *Cuffy*, 505 N.E.2d at 940) (citations from
*Cuffy* omitted)).

[16] With respect to public policy, the Court acknowledged existing law "reflecting a
public policy that the mere existence of rescue services does not, standing alone,
impose upon the governmental entity a duty to use them for the benefit of a
particular individual." *Mullin*, 639 N.E.2d at 284. The Court recognized,
however, that "where a governmental entity is aware of the plight of a
particular individual and leads that person to believe that governmental rescue
services will be used, and the individual detrimentally relies on that promise, it
would be unfair to leave that individual worse off than if the individual had not
sought assistance from the government at all." *Id*. at 284-85.

[17] Similar considerations are at play in the instant case. A special relationship was
clearly established when Doe made the call to the DCS hotline and, after
making his report, indicated his reluctance to give identifying information.
Justifiably relying on the DCS employee's explicit assurance that such
information would be kept confidential, Doe then provided the information.
The reasonable foreseeability of harm to Doe and his family upon improper
disclosure of this information was evident, as implicitly recognized by DCS's

own policies and I.C. § 31-33-18-2. Ultimately, the Does were left in a far worse position after Doe called the hotline and relied on DCS's promise.

[18] DCS argues that *Kohler* and *Mullin* addressed a governmental entity's failure to come to the rescue, not failure to maintain confidentiality.[4] Undeniably, this case presents a different context, but the factors set out in *Mullin* may be seamlessly applied here to determine whether to impose a private duty on DCS. Further, it is important to recognize that the Does are not seeking to enforce a general right of confidentiality. Their argument, rather, is based on the special relationship established between DCS and Doe during the call in which the assurance was made and reasonably relied upon to the Does' detriment.

[19] Under the specific circumstances of this case, the Does have established the existence of a private duty owed to Doe by DCS. Accordingly, we reverse the entry of summary judgment and remand this action to the trial court for further proceedings.

[20] Judgment reversed and cause remanded.

Kirsch, J., concurs.

---

[4] DCS also notes that a civil action based on the failure to report child abuse is not authorized at common law. *Borne by Borne v. Nw. Allen Cnty. Sch. Corp.*, 532 N.E.2d 1196, 1203 (Ind. Ct. App. 1989), *trans. denied.* In *Borne*, we observed that maintenance of such an action at common law "would raise substantial questions of causation since the failure [to report] would not in the direct sense be a proximate cause of the injury to the child." *Id.* Establishing causation in the case at hand will not raise similar problems because the alleged damages flowed directly from DCS's failure to maintain confidentiality of Doe's identity, which it obtained with an express assurance of confidentiality.

Vaidik, C.J., dissents with opinion.

| | |
|---|---|
| John Doe #1, et al., | Court of Appeals Case No. |
| *Appellants - Plaintiffs,* | 49A02-1506-CT-682 |
| v. | |
| Indiana Department of Child Services, | |
| *Appellee – Defendant.* | |

**Vaidik, Chief Judge, dissenting**

[21] I respectfully dissent. Although the majority left "for another day" the issue of whether Indiana Code section 31-33-18-2 creates a private right of action when DCS fails to protect the identity of a person who reports child abuse or neglect, I believe that this issue must be addressed and that the legislature did not intend to create a private right of action. And because there is no private right of action under the statute, there is no special relationship between DCS and a person who reports child abuse or neglect when that DCS employee essentially reiterates the requirements of the statute to the reporter. Put differently, no special relationship was created when Doe called the DCS hotline and was told by the DCS employee that his information was confidential, because the DCS employee's response was nothing more than a statement of what Section 31-38-

18-2 requires.  I would therefore affirm the trial court's grant of summary judgment in favor of DCS.

[22]    I first note, as the majority recognizes, that Doe does not argue that there is a common-law duty of confidentiality between DCS and those who report child abuse or neglect.  *See* slip op. at 10.  Indeed, with the exception of the attorney-client privilege, there are no common-law privileges in Indiana.  *See, e.g.*, *State v. Int'l Bus. Machs. Corp.*, 964 N.E.2d 206, 209-10 (Ind. 2012) (noting that in Indiana privileges are statutory in nature).  The Indiana General Assembly, however, has enacted a comprehensive statutory scheme governing the reporting and investigation of child abuse or neglect, which includes confidentiality provisions.  The scheme's purpose is to:

> (1) encourage effective reporting of suspected or known incidents of child abuse or neglect;
>
> (2) provide effective child services to quickly investigate reports of child abuse or neglect;
>
> (3) provide protection for an abused or a neglected child from further abuse or neglect;
>
> (4) provide rehabilitative services for an abused or a neglected child and the child's parent, guardian, or custodian; and
>
> (5) establish a centralized statewide child abuse registry and an automated child protection system.

Ind. Code § 31-33-1-1. As part of this scheme, an individual who has reason to believe that a child is a victim of child abuse or neglect has a duty to immediately make a report to either DCS or local law enforcement. Ind. Code §§ 31-33-5-1, -4. The statutes presume that a report is made in good faith and immunize from civil or criminal liability the person who made the report. Ind. Code § 31-33-6-1, -3; *see also Smith v. State*, 8 N.E.3d 668, 683 (Ind. 2014) (explaining that this statutory scheme is designed "to err on the side of *over reporting suspected child abuse or neglect*"), *reh'g denied*. Although the reporter is immune from civil and criminal liability, a person who fails to make a report as required by Section 31-33-5-1 commits a Class B misdemeanor. Ind. Code § 31-33-22-1(a).

[23] This statutory scheme also addresses confidentiality. Indiana Code section 31-33-7-4 provides that DCS "shall make a written report" of a child who may be a victim of child abuse or neglect within forty-eight hours of receiving the oral report required of individuals by Section 31-33-5-4. The statute also lists the requirements of the written reports, including "[t]he source of the report." Ind. Code § 31-33-7-4(b)(5). These reports are confidential. *See* Ind. Code § 31-33-18-1. Section 31-33-18-2 lists approximately twenty-five groups of people to whom such reports may be made available, including police, prosecutors, and doctors. Reports may be made available to other people too, provided that the reporter's identity is protected. For example, Section 31-33-18-2(8) provides that the reports shall be made available to the parent, guardian, custodian, or other person responsible for the welfare of the child named in the report;

however, the identity of the reporter must be protected. Likewise, Section 31-33-18-2(14) provides that the reports shall be made available to the "person about whom a report has been made"; however, the identity of a person reporting known or suspected child abuse or neglect must be protected. A public employee or official who knowingly or intentionally discloses information classified as confidential by state statute commits a Class A infraction. Ind. Code § 5-14-3-10(a). In addition, the public employee may be disciplined. I.C. § 5-14-3-10(b).

[24] With this statutory backdrop in mind, I address whether Indiana Code section 31-33-18-2 creates a private right of action. Sometimes the legislature explicitly provides that a private citizen has a right to sue when a statute is violated. *Blanck v. Ind. Dep't of Corr.*, 829 N.E.2d 505, 509 (Ind. 2005); *see also State Bd. of Tax Comm'rs v. Town of St. John*, 751 N.E.2d 657, 661 (Ind. 2001) (giving numerous examples of where the legislature has explicitly provided a private right of action). But when the legislature has not explicitly provided a private right of action to enforce the provisions of a statute, courts are frequently asked to find that the legislature intended that a private right of action be implied. *Blanck*, 829 N.E.2d at 509. In order to decipher legislative intent in these circumstances, the general rule is that a private right of action will not be inferred where a statute (1) is designed to protect the public in general and (2) contains a comprehensive enforcement mechanism. *LTV Steel Co. v. Griffin,* 730 N.E.2d 1251, 1260 (Ind. 2000); *Blanck*, 829 N.E.2d at 509; *see also Borne by Borne v. Nw. Allen Cnty. Sch. Corp.*, 532 N.E.2d 1196, 1203 (Ind. Ct. App. 1989) ("[I]f

it appears that the duty imposed is merely for the benefit of the public, and the fine or penalty a means of enforcing the duty and punishing a breach thereof, the fine or penalty is exclusive, and a private action cannot be maintained for injury by reason of the breach." (quotation omitted)), *trans. denied*. "However, even if a statute incidentally benefits individuals while furthering more general public goals, this "does not alone support the finding of a private cause of action." *Lockett v. Planned Parenthood of Ind., Inc.*, 42 N.E.3d 119, 128 (Ind. Ct. App. 2015), *reh'g denied*, *trans. denied*; *see also F.D. v. Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 143 (Ind. 2013) ("But even where a duty benefits an individual, we will not infer a private right of action unless that appears to be the Legislature's intent.") (Rush, J., concurring in part and dissenting in part). As then-Justice Rush pointed out in *F.D.*, "Indiana courts have rarely concluded the Legislature intended to confer a private right of action." *F.D.*, 1 N.E.3d at 143 (Rush, J., concurring in part and dissenting in part).

[25] I do not believe that the legislature intended that a private right of action be implied here. The statutory scheme is designed to protect children, and it accomplishes this by encouraging effective reporting by the public and then providing for the quick investigation of those reports. *See* I.C. § 31-33-1-1; *Borne*, 532 N.E.2d at 1203 ("The legislative purpose relative to reports by members of the public is stated as one to *encourage* effective reporting."). The purpose of the confidentiality requirement is to encourage reporting—not to protect against the harm that might occur when a reporter's identity is revealed. Moreover, the statute contains no civil-enforcement provisions, and the

legislature has provided that public employees or officials who disclose confidential information are subject to a Class A infraction. *See Americanos v. State*, 728 N.E.2d 895, 898 (Ind. Ct. App. 2000) (explaining that the presence of a provision providing for a criminal penalty "impliedly reveals the legislature's intent not to provide a civil remedy"), *trans. denied*.

[26] In addition, this Court has already determined that victims of child abuse or neglect do not have a private right of action against people who fail to report the child abuse or neglect. *See Sprunger v. Egli,* 44 N.E.3d 690, 693 (Ind. Ct. App. 2015); *C.T. v. Gammon*, 928 N.E.2d 847 (Ind. Ct. App. 2010). Accordingly, if *victims* of child abuse or neglect do not have a private right of action under this statutory scheme, then it logically follows that *reporters* of child abuse or neglect should not either. I therefore conclude that the legislature did not intend to create a private right of action when DCS violates Section 31-33-18-2's confidentiality requirement.

[27] Also, I disagree with the majority's conclusion that "DCS owed Doe a private duty based on the common law." Slip op. at 7. First, I doubt whether the test in *Mullin* even applies to this situation because it appears that the test is geared toward the provision of "rescue services." *See Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 284-85 (Ind. 1994) ("[W]here the governmental entity is aware of the plight of a particular individual and leads that person to believe that governmental rescue services will be used, and the individual detrimentally relies on that promise, it would be unfair to leave that individual worse off than if the individual had not sought assistance from the government at all."

(emphasis added)). But even if the test applied here, I do not believe that a special relationship was created when Doe called the DCS hotline and the DCS employee told Doe the following about his name and phone number: "Well, it's confidential. Nobody will find out." Appellants' App. p. 44. The DCS employee's response to Doe was nothing more than a statement of what Section 31-33-18-2 requires. To allow a common-law claim in these circumstances would provide an end-run around the legislature's intent that Section 31-38-18-2 does not create a private right of action when DCS fails to protect a reporter's identity.

[28] I would therefore affirm the trial court's grant of summary judgment in favor of DCS.